**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 1 4 2014

for CHIEF JUSTICE

This opinion was filed for record
at 8:00 AM on Aug. 14, 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| WASHINGTON EDUCATION ASSOCIATION; STACIA BILSLAND and KATHLEEN RANEY, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) | No. 88546-0 |
| Respondents, | ) ) |  |
| v. | ) ) |  |
| WASHINGTON DEPARTMENT OF RETIREMENT SYSTEMS; STATE OF WASHINGTON, | ) ) ) ) |  |
| Petitioners. | ) ) | En Banc |
| WASHINGTON FEDERATION OF STATE EMPLOYEES; PAULETTE THOMPSON; BOB KELLER, and all others similarly situated, | ) ) ) ) ) |  |
| Respondents, | ) ) |  |
| v. | ) ) |  |
| WASHINGTON DEPARTMENT OF RETIREMENT SYSTEMS; STATE OF WASHINGTON, | ) ) ) ) | Filed _____ AUG 1 4 2014 |
| Petitioners. | ) ) |  |

RETIRED PUBLIC EMPLOYEES COUNCIL )
OF WASHINGTON; and HOWARD N. )
JORGENSON, on his own behalf and on )
behalf of all similarly situated individuals, )
                                       )
                 Respondents, )
                                         )
       v. )
                                         )
WASHINGTON DEPARTMENT OF )
RETIREMENT SYSTEMS; STATE OF )
WASHINGTON, )
                                         )
                 Petitioners. )
_____)

MADSEN, C.J.—The Washington Department of Retirement Services (DRS) and the State of Washington petition for review of an order granting summary judgment to a class of public employee unions and unaffiliated employees and holding that the 2011 repeal of legislation granting future uniform cost of living adjustments (UCOLA) to the respondents' monthly pension payments was an unconstitutional impairment of the State's contractual obligation with its employees. We disagree because the legislature reserved its right to repeal the pension rights at issue and the original enactment of UCOLA did not impair any existing contract rights of state employees. Accordingly we reverse.

FACTS AND PROCEDURAL HISTORY

The Public Employees' Retirement System (PERS) Plan 1 and the Teachers' Retirement System (TRS) Plan 1 governed the state's pre-1977 pension program for school teachers, administrators, and other state employees. Because PERS Plan 1 and

2

TRS Plan 1 provide substantially the same benefits, they will together be referred to as "Plan 1." On October 1, 1977, the legislature eliminated Plan 1 as an option for new employees, replacing Plan 1 with Plan 2 and later adding Plan 3 as a second option. Current Plan 1 members therefore all entered state employment before October 1, 1977. Plan 1 is a defined benefit plan where, after retirement, members are paid a fixed monthly pension amount irrespective of their level of contribution. A statutory formula determines Plan 1 members' pension amounts, looking to the members' years of service and average compensation level during their highest two consecutive years. *See* RCW 41.32.498; RCW 41.40.185 (outlining that the Plan 1 annual retirement allowance shall be two percent of the employee's average final compensation for each service credit year). Plan 1 is contributory; the benefit is paid out of contributions from the employer and the employee, as well as investment returns on prior contributions. Employee contribution is capped, whereas the employer contribution level can vary with need and is set by the legislature biennially. As it originally stood, Plan 1 did not include any adjustment for changes in cost of living.

As the years progressed, pressure mounted to adjust pensions to reflect greater retiree longevity and increased inflation. Beginning in the early 1970s, the legislature enacted a series of cost of living adjustments (COLAs) that were limited to specific groups and time periods. In 1973, the legislature provided an adjustment based on a cost of living factor. This COLA stated that an adjustment "shall" be made, "provided, that the department finds, at its sole discretion" that the system assets could fund the COLA.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Former RCW 41.32.499 (1994) (capitalization omitted); former RCW 41.40.195 (1994). Under this scheme, COLAs were never granted to TRS Plan 1 employees and were granted only through 1980 to PERS Plan 1 employees. Hence, for the 15 years prior to the creation of a uniform COLA system in 1995, DRS never exercised its discretion to grant a COLA under the 1973 provision. In subsequent years the legislature enacted three other COLAs to benefit discrete populations of the state employee community: minimum retirement allowance recipients, retirees whose benefit had lost a specified amount of its purchasing power, and retirees who were at least 70 years old.[1]

In 1995, motivated by the desire to simplify calculations, expand coverage, and streamline the administration of COLA benefits, the legislature passed a UCOLA scheme. LAWS OF 1995, ch. 345, § 1. UCOLA repealed the 1973 COLA and the purchasing power COLA, and made the age-70 COLA permanent for those already receiving it. FINAL B. REPORT ON SUBSTITUTE S.B. 5119, 54th Leg., Reg. Sess. (Wash. 1995). UCOLA also replaced the old minimum benefit COLA with a new minimum

---

[1] In 1987, the legislature enacted a COLA for the minimum retirement allowance—a fixed dollar amount provided to retirees whose pension benefit as otherwise calculated would fall below the minimum amount. Under this COLA, the minimum retirement allowance increased each year by the change in the consumer price index (CPI) or three percent, whichever was lower. Former RCW 41.32.487 (1994); former RCW 41.40.1981 (1994). In 1989, the legislature enacted a "Plan 1 COLA," which provided an annual increase of three percent or inflation (whichever was less) to any Plan 1 retiree whose benefit lost more than 40 percent of its purchasing power compared to their benefit at age 65. Former RCW 41.32.575 (1994); former RCW 41.40.325 (1994). Adjustments were tied to the CPI. In 1993, the legislature enacted an "age-70 COLA," which granted a one-time increase of three dollars per year of service to retirees who were at least 70 years old as of July 1, 1993; had been retired for at least five years; and were not already receiving either the Plan 1 COLA or the minimum retirement allowance. Former RCW 41.32.4871 (1994); former RCW 41.40.1983 (1994).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

allowance of $24.22 per year of service, to be adjusted annually for cost of living in the same manner as all pensions. RCW 41.32.4851; RCW 41.40.1984.

UCOLA created a monthly increase amount per year of service (annual increase amount). LAWS OF 1995, ch. 345, §§ 2, 5. At the time of UCOLA's enactment in 1995, the annual increase amount was $0.59 per year of service. Former RCW 41.32.010(47) (1995); former RCW 41.40.010(40) (1995); Br. of Pet'rs' at 8 n.10.[2] Disbursement of UCOLA benefits was not linked to actual increases in cost of living or inflation; the annual increase amount accrued automatically each year to eligible Plan 1 retirees. *See* former RCW 41.32.489(1) (1995); former RCW 41.40.197(1) (1995). Under UCOLA, the initial annual increase amount of $0.59 increased by three percent each year so that in 2011, it was set at $1.94 per year of service. Former RCW 41.32.010(47); former RCW 41.40.010(40) (1995); Br. of Pet'rs' at 8 n.10.[3]

To prevent a perpetual obligation to increase the COLA amount each year, the legislature included a clause that reserved its right to modify or repeal the UCOLA scheme in the future and specified that it was not creating any contract rights. Former RCW 41.32.489(6); former RCW 41.40.197(6). "The legislature reserves the right to amend or repeal this section in the future and no member or beneficiary has a contractual right to receive this postretirement adjustment not granted prior to that time." Former RCW 41.32.489(6); former RCW 41.40.197(6).

---

[2] For example, in 1995, a retiree with 30 years of experience would receive $17.70 per month ($0.59 times 30) in addition to a basic pension.

[3] In 2011, for example, a retiree with 30 years of experience would receive $58.20 per month ($1.94 times 30) in addition to a basic pension.

5

In 2011, responding to the ongoing financial crisis and state actuary reports that Plan 1 was underfunded, the legislature exercised its reserved right and repealed UCOLA. LAWS OF 2011, ch. 362, § 1 ("The legislature now finds that changing economic conditions have also made necessary the amendatory provisions contained in this act."). Because employee contribution to Plan 1 was capped and the legislature was reluctant to force employers to contribute more, UCOLA was being funded primarily with current Plan 1 assets. Plan 1 thus became underfunded and the legislature responded with repeal. Under the terms of the repeal, the annual increase amount will cease increasing by three percent each year. Instead, it will remain locked at the July 1, 2010 amount per service year. RCW 41.32.489(1); RCW 41.40.197(1). Retirees already receiving pension payments will not lose the UCOLA amounts that have already been designated to them but in the future will receive pensions as adjusted on July 1, 2010 rather than the current year. Plan 1 employees who have not yet retired will not receive any UCOLA adjustments. RCW 41.32.489(1)(b) ("After July 1, 2010, no annual increase amounts may be provided to any beneficiaries who are not already receiving benefits under this section."); RCW 41.40.197(1)(b) (same). The legislature excluded the minimum benefit COLA from the repeal and in fact increased the minimum benefit amount. RCW 41.32.4851; RCW 41.40.1984. The minimum benefit thus continues to be adjusted upward each year. The state actuary estimates that the repeal of UCOLA will save the state over seven billion dollars over the next 25 years.

On October 12, 2011, the Washington Education Association and a class of Plan 1 employees filed a complaint in Thurston County Superior Court challenging the 2011 repeal of UCOLA. The plaintiffs raised four claims, one of which alleged that the repeal of UCOLA was an unconstitutional impairment of the state's contract with its employees.[4] In April 2012, the plaintiffs filed a motion for summary judgment on this contract impairment claim. The trial judge granted summary judgment to the plaintiffs, reasoning that the repeal was an unconstitutional impairment. The defendants, DRS and the State, then filed a motion for certification under RAP 2.3(b)(4) and a notice of discretionary review in this court. The trial court certified a class that includes all Plan 1 members, retired or working, all of whom became state employees prior to October 1, 1977.[5] In June 2013, this court granted the petitioners' motion for discretionary review to address their contract impairment claim and designated the case for direct review under RAP 6.2(a) as a companion to the gain-sharing case already pending with the court.[6]

---

[4] The other causes of action included violation of due process, equitable and promissory estoppel, and breach of contract.

[5] The class is defined as "[a]ll individuals who are active, retired, or terminated members of PERS 1 and TRS 1 who, as of July 1, 2011: (a) have not yet reached age 66 or who have not yet retired or (b) are retired and are receiving the Uniform COLA or (c) would have been eligible to receive Uniform COLA payments in 2011 but who have not received Uniform COLA payments and/or will not receive such payments in the future under the terms of [Substitute H.B. 2021, 62d Leg., Reg. Sess. (Wash. 2011)]; but excluding individuals receiving the basic or alternative minimum benefit." Clerk's Papers at 457. Thus, Plan 1 members who qualify for the alternative minimum benefit are not included in the class.

[6] Under the challenged gain-sharing legislation, if the Plan 1 investment return exceeded 10 percent per year over the past four years, the amount above that 10 percent would be "shared" with Plan 1 retirees via an increase to the UCOLA annual increase amount. Former RCW 41.31.010 (2006); former RCW 41.31.020 (2006); former RCW 41.31A.020 (2006). Like UCOLA, the gain-sharing legislation reserved the right of the legislature to amend or repeal gain sharing and advised that it was not creating any contractual rights. Former RCW 41.31.030 (2006). In 1998, the legislature repealed gain sharing, and a group of employees and unions

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ANALYSIS

Standard of Review

This court reviews summary judgment de novo. *Retired Pub. Emps. Council of Wash. v. Charles*, 148 Wn.2d 602, 612, 62 P.3d 470 (2003). This court presumes that statutes are constitutional as enacted. The challenging party, in this case the respondents, must establish that "'there is no reasonable doubt that the statute violates the constitution.'" *Pierce County v. State*, 159 Wn.2d 16, 27, 148 P.3d 1002 (2006) (quoting *Larson v. Seattle Popular Monorail Auth.*, 156 Wn.2d 752, 757, 131 P.3d 892 (2006)).

Impairment of Public Pension Contracts: The Legal Standard

Article I, section 23 of the Washington Constitution provides that "[n]o bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed." This protection echoes the parallel federal constitutional provision, which prohibits states from passing "any . . . law impairing the obligation of contracts." U.S. CONST. art. I, § 10. In Washington, the state and federal contracts clauses are given the same effect. *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 402, 869 P.2d 28 (1994). When a private contract is impaired, some deference to the legislature is warranted. *See, e.g., Wash. Fed'n of State Emps. v. State*, 127 Wn.2d 544, 560-61, 901 P.2d 1028 (1995). But when a state impairs its own contract, courts apply more stringent review. *Id.* At the same time, this court is hesitant to infer contract rights from a statute. *See, e.g., id.* at 561-62; *Noah v. State*, 112 Wn.2d 841, 843-44, 774 P.2d

---

challenged the repeal as an unconstitutional impairment of contract. We accepted review and designated the two cases to be heard together as companions.

8

516 (1989). We have recognized that state pension statutes can create enforceable contract rights. *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 698-701, 296 P.2d 536 (1956).

*Bakenhus* is considered "our leading statement on the basic legal nature of public pensions." *Leonard v. City of Seattle*, 81 Wn.2d 479, 485, 503 P.2d 741 (1972). The plaintiff in *Bakenhus*, a police officer who retired in 1950, was entitled to a pension of $185 per month under the law existing at the time he was hired in 1925. *Bakenhus*, 48 Wn.2d at 696-97. An amendment to the city pension law in 1937 instituted a $125 per month maximum for pension payments, and the plaintiff sued, alleging that the amended law was an impairment of his pension contract with the city. *Id.* at 697. This court ruled for the plaintiff and held that pensions are "deferred compensation for services rendered" and therefore create a contract that can be modified only to ensure the continued flexibility and integrity of the system. *Id.* at 698, 701. Modifications that have an adverse effect on employees must be accompanied by "'comparable new advantages.'" *Id.* at 702 (quoting *Allen v. City of Long Beach*, 45 Cal. 2d 128, 131, 287 P.2d 765 (1955)). The court noted that "[a]pproximately one third of the anticipated pension has been removed with no *corresponding* benefit, and no showing by the appellants that the reduction was necessary to preserve and perfect the system, nor that it bore any reasonable relation to the purposes of the pension plan." *Id.* at 703. The *Bakenhus* principles have historically defined the analysis for impairment of public pension contracts in this state.

Independently of the *Bakenhus* line of pension cases, this court developed an analysis for impairment of other public contracts. Originating in *Carlstrom v. State*, 103 Wn.2d 391, 394-99, 694 P.2d 1 (1985), this test provides that legislation will unconstitutionally impair a public contract only if it substantially impairs an existing contractual relationship and is not reasonable and necessary to serve a legitimate public purpose. Subsequent cases have divided the test into three distinct parts: (1) whether a contractual relationship exists; (2) whether the legislation substantially impairs the contractual relationship; and (3) if there is substantial impairment, whether the impairment is reasonable and necessary to serve a legitimate public purpose. *Charles*, 148 Wn.2d at 624; *Tyrpak v. Daniels*, 124 Wn.2d 146, 152, 874 P.2d 1374 (1994).

The State argues, and we agree, that the *Carlstrom* public contract test applies with equal force to public pension contracts. The *Carlstrom* test governs the impairment of public contracts, of which pension statutes like UCOLA are one category. *E.g.*, *Wash. Fed'n*, 127 Wn.2d at 561; *Caritas*, 123 Wn.2d at 402-03; *Carlstrom*, 103 Wn.2d at 394-98. Although the *Bakenhus* and *Carlstrom* lines have developed separately, the *Carlstrom* public contract test in reality forms the backbone of the analysis in pension cases. We intimated this result in *Charles*, 148 Wn.2d at 624, where we applied the *Carlstrom* test to a public pension contract. We now make explicit what was implicit in *Charles*: when analyzing whether a law impairs public pension contracts we will apply the same three-part test governing all public contracts. Within this overarching

10

framework, the *Bakenhus* requirements of flexibility, integrity, and comparable new advantages focus the *Carlstrom* test in the specific context of public pension rights.

Application: No Impairment of Contract

The respondents frame their argument as a challenge to the 2011 repeal of UCOLA. They contend that the original enactment of UCOLA in 1995 did not impair existing contract rights because UCOLA could have been left in place or been repealed in a constitutional manner. Resp'ts' Answer to Pet'rs' Suppl. Br. at 2-3. The impairment of employees' contract rights, they argue, did not occur until 2011 when the legislature repealed UCOLA without complying with the dictates of *Bakenhus*. *Id.* We reject this argument.

Even assuming that the 2011 repeal legislation affected an existing contractual relationship, satisfying the first part of the *Carlstrom* test, the repeal legislation did not substantially impair the contractual relationship as reflected in the 1995 UCOLA statute. Indeed, the authority to repeal the UCOLA was contained in the 1995 UCOLA legislation. Merely acting upon that authority did not alter any contract that was formed by the 1995 UCOLA legislation. Moreover, the respondents' argument is circular. Striking down the repeal legislation would reinstate the 1995 UCOLA statute, which includes a provision expressly reserving the right to repeal. The respondents' contract rights are defined by the language of the statute creating those rights. Here, that language includes a right to amend or repeal. If the respondents' contract rights were violated, they were violated by the enactment of UCOLA or by including a reservation of rights

11

provision in that legislation. The 2011 repeal merely executed a provision of the established contract.

The respondents make two additional points to support their argument. First, they assert that UCOLA's reservation language is unenforceable. Br. of Resp'ts at 30-39. Alternatively, they argue that the 1995 enactment of UCOLA impaired their contract rights by repealing the 1973 COLA without providing comparable new advantages. Resp'ts' Answer to Pet'rs' Suppl. Br. at 3-4. Neither of these arguments establishes an impairment of the pension contract.

Turning first to the reservation clause, no Washington court has held such a clause unenforceable in a public pension statute and the respondents' statements otherwise are incorrect. The respondents rely on *Jacoby v. Grays Harbor Chair & Manufacturing Co.*, 77 Wn.2d 911, 468 P.2d 666 (1970), where this court, in dicta, did suggest that an employer's reservation of the right to amend or terminate a pension plan cannot defeat contractual rights created under that plan. However, the reservation clause in *Jacoby* was different in kind than that contained in the UCOLA statute. In *Jacoby*, the reservation clause appeared in a contract between a private employer and an assurance company where the employer agreed to deposit money with the company and the company agreed to purchase annuities to fund the employees' pensions as they became payable. *Id.* at 912. The *Jacoby* employees' pension contract did not mention such a reservation and this court suggested that a reservation in the contract between the employer and the

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*assurance company* could not modify the employment contract between the employer and the *employees*. *Id.* at 916.

In contrast to *Jacoby*, the UCOLA reservation clause existed as an express provision of the statute that created the claimed pension right. Furthermore, even the respondents recognize that *Jacoby*'s comments regarding the enforceability of reservation clauses were dicta. *Id.*; Br. of Resp'ts at 32 ("The following language, although *dicta*, was relied on in *Navlet*[ *v. Port of Seattle*, 164 Wn.2d 818, 194 P.3d 221 (2008)] and is applicable here."). In *Jacoby*, this court ultimately held that the employee plaintiff was not eligible for a pension because the contract unambiguously limited application to employees who had been working for at least 10 years after the plan was implemented. 77 Wn.2d at 917. The court did not need to reach the reservation clause because the contract expressly excluded the plaintiff from the pension plan. *Id.*

The respondents also rely on *Navlet*. In *Navlet* this court did rely on *Jacoby* to strike a reservation clause contained in materials accompanying a collective bargaining agreement (CBA) provision for welfare benefits. There, when the CBA expired, the employer ceased contributing to his employees' welfare benefits trust as had been outlined in the CBA. *Navlet*, 164 Wn.2d at 824-27. The trust agreement and summary that accompanied the CBA reserved the right of the employer to amend or repeal the welfare benefits program and this court held such a reservation unenforceable. *Id.* at 848-49. However, the court recognized that the reservation clause would have been enforceable if it had been placed "in the CBA itself" instead of in the accompanying

13

documents. *Id.* at 849. Here, the reservation clause is part of the UCOLA statute which, like the CBA in *Navlet*, is the source of the employees' claimed contractual right. The *Navlet* analysis does not support the respondents' claim that a reservation clause cannot be given effect when it is contained in the statute creating the benefit.

Rules of statutory construction demand enforceability of the reservation clause. Plan 1 members are bound by the terms of their employment contract. *See Jacoby*, 77 Wn.2d at 916 ("Where a private pension plan creates a contractual obligation between employer and employee, the rights and obligations of the parties must be measured by the terms of the contract under the ordinary rules of contractual construction."); *see also Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007) (stating that "where 'a statute is clear on its face, its meaning [should] be derived from the language of the statute alone'" (alteration in original) (quoting *Kilian v. Atkinson*, 147 Wn.2d 16, 50 P.3d 638 (2002)). The ordinary rules of construction link the enforceability of reservation clauses to the degree of specificity contained in the clause. *See, e.g., Wash. Fed'n*, 127 Wn.2d at 563 ("To be effective as a reservation of powers clause, the language must specifically and explicitly mention future retroactive modification of preexisting or already performed contracts."); *Caritas*, 123 Wn.2d at 406-07 (holding a reservation clause unenforceable and reasoning that "our case law requires such reservation clauses to be made *explicitly* contingent on future acts of the Legislature with retroactive effect"); *Carlstrom*, 103 Wn.2d at 398 (holding a reservation clause unenforceable because it was not specific enough and reasoning that "[t]he Legislature

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

knows how to use plain English to make existing contracts subject to future modification"). Here, the legislature could not have been more explicit in reserving the power to amend the UCOLA statute and disclaiming any grant of contractual rights. The legislature's inclusion of the reservation clause in the 1995 UCOLA statute therefore does not violate any vested rights of the Plan 1 employees.

The nature of the UCOLA benefit also supports the enforceability of the legislature's right to repeal this benefit. Employees do not contribute to the UCOLA and the adjustment provided is not "pay withheld to induce continued faithful service" in the same way that a basic pension plan is. *Jacoby*, 77 Wn.2d at 915; *see also Bakenhus*, 48 Wn.2d at 700 (quoting *Giannettino v. McGoldrick*, 295 N.Y. 208, 66 N.E.2d 57, 59 (1946)). This is particularly true of members who retired prior to UCOLA's enactment in 1995. Whereas a basic pension plan is deferred compensation and induces long and faithful service over time, a COLA merely enhances the value of the basic pension payment by adjusting for inflation and cost of living increases. Surely the legislature can make the addition of such a bonus subject to its right to amend or repeal the program in the future. To say otherwise would strongly disincentivize the legislature from providing additional benefits beyond a basic pension. Although the UCOLA relates to the basic pension plan, it differs significantly from the deferred and compensatory basic pension that was at issue in *Bakenhus*.

The respondents' alternative argument that rights created under the 1995 UCOLA constitute an impairment because UCOLA repealed the 1973 COLA statute without

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

providing comparable new advantages also fails. As a preliminary matter, the majority of the respondents' class is time barred from bringing this claim. It is well settled that retirees are subject to a three-year statute of limitations for actions alleging a breach of pension contracts. *See, e.g., Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 79-80, 847 P.2d 440 (1993); *Noah*, 112 Wn.2d at 842-43. As the respondents recognize, this three-year clock begins to run at the time of retirement. Resp'ts' Answer to Pet'rs' Suppl. Br. at 8-11; *see also Bowles*, 121 Wn.2d at 79-80; *Noah*, 112 Wn.2d at 842-43. Yet 60 percent of class members have already retired and thus are time barred unless they retired fewer than three years before the time of suit. *See* Resp'ts' Answer to Pet'rs' Suppl. Br. at 7-8. Only the approximately 40 percent of the class who has not yet retired has standing to raise this argument. Though this 40 percent of employed class members is not time barred, their challenge fails on substantive grounds under the *Carlstrom* public contract test as informed by *Bakenhus*.

The first prong of the *Carlstrom* test considers whether a contract exists. Arguably the 1973 COLA did not create a contract because the rights it formed were illusory. Disbursement of COLA benefits under the 1973 COLA was subject to DRS's discretionary finding that Plan 1 was adequately funded and could support such a benefit payout. The respondents contend that the 1973 COLA provided a concrete benefit because it required DRS to consider the system's capacity to fund a COLA each year. Yet the 1973 statute made the ultimate decision subject to DRS's discretion, which in practice DRS rarely chose to exercise. Indeed, for the 15 years leading up to the

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

enactment of UCOLA, DRS never once found the requisite funding to support a COLA

under the 1973 Act. In statutory language and in practice, the 1973 COLA did not

provide employees with any concrete pension benefits and therefore did not become part

of their employment contract with the State.

Even if we agreed with the respondents that the 1973 COLA created a contract

right to annual legislative consideration of the feasibility of granting a COLA, the

respondents' claim fails the second prong of the *Carlstrom* analysis. If a contract right

exists, the second prong considers whether the challenged legislation has substantially

impaired that contract right. We hold that in public pension cases, substantial impairment

is measured by the implied consent and comparable new advantages analysis established

by *Bakenhus* and its progeny. *Bakenhus* itself held that where modifications to pension

rights were disadvantageous to employees, there would be no contract impairment so

long as those disadvantageous modifications were accompanied by comparable new

advantages. 48 Wn.2d at 701-03. Because the amount of Bakenhus's pension had been

reduced without any "corresponding benefit," this court found contract impairment. *Id.*

at 703 (emphasis omitted). Subsequent cases have phrased this comparable new

advantages requirement as one of implied consent. For example, in *Washington*

*Federation of State Employees v. State*, we held:

> The rule announced [in *Bakenhus*] stands for the proposition that pension
> rights are contractual rights which vest at the beginning of the employment
> relationship. The State cannot alter that contract without mutual consent.
> Where the change is favorable to the employee, consent will be implied.
> Conversely, where the change is disadvantageous, consent will be

17

presumed not to have been given unless the change is made concurrently with an added benefit.

98 Wn.2d 677, 686, 658 P.2d 634 (1983) (citations omitted); *see also Vallet v. City of Seattle*, 77 Wn.2d 12, 21-22, 459 P.2d 407 (1969) (affirming that "'an act of the legislature, making a change in pension rights, will be weighed against pre-existing rights in each individual case to determine whether it is reasonable and equitable. If the over-all result is reasonable and equitable, the employees (prospective pensioners) will be presumed to have acquiesced in the modifications.'" (quoting *Dailey v. City of Seattle*, 54 Wn.2d 733, 738, 344 P.2d 718 (1959)); *Dailey*, 54 Wn.2d at 739, 740-42 (reasoning that "the acquiescence of the employees concerned is to be presumed where some advantages have been sacrificed to gain compensating or greater benefits"). All this is to say that a modification of a pension contract will not substantially impair an existing contract if the overall result of the change is favorable to employees. Whether an alteration is favorable to employees is a fact-specific question that must be measured by the totality of the circumstances.

Applying this analysis to the 1995 enactment of UCOLA, it is clear that the Plan 1 employees received comparable new advantages under the 1995 UCOLA program. At the time class members began working prior to 1977, their employment contract did not include any automatic COLA adjustment. Employees who started after 1973 obtained the possibility of an ad hoc COLA, but the 1973 COLA was different in kind from the UCOLA because it was explicitly discretionary and was contingent on the availability of adequate funding. In both statutory language and fact, the UCOLA system of annual

18

COLA adjustments represented a substantial improvement over the 1973 COLA. Notwithstanding its reservation clause, UCOLA provided a guaranteed right to an annual COLA of increasing amounts for as long as the program remained in effect. In contrast, the 1973 COLA did not provide any certain COLA benefits, but merely assured employees that the DRS would *consider* whether a COLA was practicable based on current funding levels. DRS rarely found adequate funding and granted a COLA, whereas retired Plan 1 members received yearly COLAs of steadily increasing amounts throughout the years that UCOLA was in effect. Although the UCOLA statute reserved the legislature's right to change or terminate the program, such reservation clauses are enforceable and even the creation of an undefined automated COLA system constitutes an added favorable benefit to the existing Plan 1 pension rights. When the legislature implemented the UCOLA scheme in 1995, it created a favorable modification to the Plan 1 employees' pension contract. We reject the respondents' argument that the 1995 UCOLA substantially impaired class members' rights by eliminating the 1973 COLA.

CONCLUSION

We hold that the *Carlstrom* three-prong test for impairment of public contracts applies to public pension contract impairment. However, the *Bakenhus* line of cases remains relevant and strongly informs our application of the *Carlstrom* test in public pension cases. In this case, neither the 1995 enactment of UCOLA nor its 2011 repeal unconstitutionally impaired the respondents' contract rights. UCOLA's reservation clause is enforceable and UCOLA's replacement of the 1973 COLA did not impair any

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

existing contract rights. We reverse the trial court's grant of summary judgment and

remand for proceedings consistent with this opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

_Madsen, C.J._

WE CONCUR:

| | |
|---|---|
| _Johnson, J._ | _Stephens, J._ |
| _Owens, J._ | _Wiggins, J._ |
| _Fairhurst, J._ | _González McCloud, J._ |
| _González, J._ | _Siddoway, J.P.T._ |

21