# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DONALD SLOMA, | No. 53054-6-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF RETIREMENT SYSTEMS, | PUBLISHED OPINION |
| Respondent. | |

WORSWICK, J. — Donald Sloma worked in a Public Employees Retirement System (PERS)-eligible employment for over 30 years. In 2004, he elected into a program for PERS 1 members with over 30 years of service credit wherein, upon retirement, he would receive a refund of all employee contributions he made to the Department of Retirement Systems (DRS) after his election date, and his retirement benefit would be calculated based on only his compensation earned prior to the election. A few months later, Sloma retired.

In 2012, Sloma began work for Thurston County, a PERS eligible employer. Sloma rejoined PERS membership and believed that when he re-retired his retirement benefit would be recalculated based on his higher Thurston County salary. But when Sloma retired, DRS limited his retirement benefit to his compensation earned prior to his 2004 election.

Sloma petitioned DRS to reverse its decision. A presiding officer granted DRS's motion for summary judgment, and Sloma sought review by the superior court. The superior court affirmed. Sloma now appeals the superior court's order affirming the Department's final order.

No. 53054-6-II

Sloma argues that (1) the Department erroneously interpreted RCW 41.40.191 to apply beyond a member's first retirement, (2) RCW 41.40.191 unconstitutionally impairs his public pension contract rights, and (3) equitable and promissory estoppel apply to compel DRS to calculate his retirement benefits using his higher Thurston County salary. We disagree and affirm the Department's final order.

## FACTS

Sloma agrees to the findings of fact contained in the Department's final order. Therefore, the findings of fact contained in the final order are verities on appeal.[1] *Tucker v. Dep't of Ret. Sys.*, 127 Wn. App. 700, 705, 113 P.3d 4 (2005). Accordingly, the following facts are primarily from the Department's final order.

### I. DRS, PERS, PLAN 1, POST 30-YEAR ELECTION

DRS administers the statewide retirement systems for public employees, including PERS. PERS comprises three plans—PERS 1, PERS 2, and PERS 3. A PERS member who meets the statutory conditions for retirement receives a defined retirement benefit that is paid monthly for life. A PERS 1 member who completes 30 years of creditable service can retire for service with a full benefit, without regard to his or her age.

PERS defined retirement benefits are funded in part by contributions to the system from both the employee-member and the member's employer. A PERS 1 member must contribute six percent of his compensation to the system while in PERS-covered employment. An individual PERS member's retirement benefit is determined by a statutory formula that takes account of the

---

[1] Except for finding of fact 10, which we consider a conclusion of law.

2

compensation and service credit the member earned while working for retirement system employers. One component of the formula is average final compensation (AFC). In PERS 1, AFC is the annual average of the member's highest salary during any consecutive two-year period of PERS service. A PERS 1 retirement benefit is said to be "capped" at 30 years of service because service beyond 30 years may not be used to increase the member's benefit above 60 percent of AFC.

In 1999, the legislature created a new option for members of PERS 1. Those members who continue working in PERS-covered employment after they attain 30 years of creditable service can choose to obtain a refund of the PERS contributions they make after that point. DRS refers to this option as the "post-30-year program." PERS 1 members wishing to choose this optional refund of contributions at retirement must notify DRS within six months after they have earned 30 years of service credit. Beginning the month after a member chooses this option, DRS must separately account for the member's employee contributions to PERS and, at retirement, refund to the member the amount of those contributions, plus interest at the rate of seven and one-half percent. Upon retirement, the retirement benefit of a member who chooses to enroll in the post-30-year program "shall be calculated using only the compensation earnable credited prior to the effective date of the member's election." RCW 41.40.191(2). Stated another way, the statute provides that the member's AFC calculation does not change after the effective date of the member's election into the post-30-year program.

Following reemployment in an eligible position, a retiree may elect to prospectively become a member of the retirement system if otherwise eligible. RCW 41.40.023(12). Such a member may retire again if eligible. RCW 41.40.037(3).

## II. SLOMA'S FIRST RETIREMENT

Sloma became a PERS 1 member in 1973. By the end of September 2003, Sloma had earned 30 years of service credit in PERS. In January 2004, Sloma began to plan for his retirement from public service. He reviewed the January 2002 version of the PERS Plan 1 Member Handbook published by DRS, which stated, in response to the question, "Can I obtain a refund of contributions paid after 30 years of service?"

> If you participate in the [post-30-year] program, your monthly retirement benefits will be based on earnings made prior to the date DRS received notice of your election to participate. Election to participate is irrevocable and must be made within six months after earning 30 service credit years.

Administrative Record (AR) at 4 (alteration in original).

Sloma submitted his notice of election into the post-30-year program on January 15, 2004. The form stated, "This is an IRREVOCABLE ELECTION. Once you have submitted this election to DRS, you cannot reverse your decision." AR at 208. By Sloma's signature, the form stated:

> I hereby elect to have my retirement contributions after 30 years of service posted to a separate account that is refundable at my retirement. I understand that contributions will be posted to the refundable account beginning the month after I submit this election form and I have accumulated at least 30 years of service credit. Furthermore, I understand that my Average Final Compensation (AFC) will be based on earnings prior to DRS receiving this election. (The AFC is used in the retirement benefit calculation to determine the amount of your monthly retirement benefit.)

AR at 208.

Sloma retired from the Department of Health effective March 1, 2004, at 54 years of age. DRS calculated his PERS AFC at $6,492.80 monthly, yielding a gross monthly retirement benefit of $3,895.68, and began paying his retirement benefit in that amount. DRS refunded to

him the PERS employee contributions he made after his election into the post-30-year program became effective, in a lump sum totaling $920.60.

In 2011, Sloma learned from his personal contacts that Thurston County's Public Health and Social Services Department director planned to retire. Sloma considered applying for the position and how it might affect his PERS retirement benefit. He thought that the director position might offer him the opportunity to "re-base" his retirement benefit based on the increased salary of the director position. Sloma applied for the position on January 30, 2012.

Thurston County offered Sloma the position sometime before April 12, 2012, but Sloma did not immediately accept. He asked Thurston County personnel staff how his PERS retirement benefit would be affected if he were to accept the position, and they referred him to DRS for specific questions.

Believing that if he accepted employment with Thurston County he could reenter active PERS membership and retire again from PERS in the future, Sloma accepted the director position. Thurston County confirmed Sloma's appointment in a letter to him on April 12, 2012, and a press release on April 13. Sloma started working for Thurston County on May 1, 2012.

### III. SLOMA'S SECOND RETIREMENT

One day after beginning work with Thurston County, Sloma spoke with Katie Sparkles, a DRS retirement analyst, on the telephone. On May 3, 2012, Sparkles e-mailed Sloma with the information he wanted "in writing." Sparkles wrote that her research and consultation with her team leader and other experienced retirement analysts, had produced answers to two of his concerns. First, he would have to work a minimum of 24 months in a new PERS-covered

position in order to change the payment (survivor) option for a future retirement benefit.[2]

Second, "any compensation you earn after returning to membership will be reviewed when determining your 24-month AFC at time of retirement." AR at 8.

Sloma responded with an attempt to further clarify that there was no minimum amount of time he needed to work in his new job to have his new earnings included in any new AFC. Sparkles responded,

> [A]fter returning to active membership it doesn't matter how long you work and then re-retire to have the new compensation and service credits counted towards re-calculating your new AFC for re-retirement. But if you decide that you want a different retirement option when you re-retire you have to work at least 24 months before you re-retire.

AR at 9. Within an hour of acknowledging Sparkles's last e-mail, Sloma e-mailed DRS, advising that he was employed with a PERS employer in a PERS-eligible position and that he wanted to start contributing to his PERS 1 retirement again.

During their 2012 interactions, neither Sloma nor Sparkles considered or discussed the post-30-year election Sloma made in 2004. Sparkles was not aware that Sloma had made the election.

While working for Thurston County, Sloma and his wife were actively looking to purchase a waterfront home. Around June 2015, they found a property that they could purchase on favorable terms. After reviewing their finances, including Sloma's anticipated post-retirement income, the couple applied for a mortgage to purchase the property. With the

---

[2] Sparkles explained, "When a member retires they have to choose one of the four retirement options and this decision is an [i]rrevocable decision. . . . The exception to this [i]rrevocable decision is, 'If you go back to work and complete two or more years as a contributing member, you can retire again and select a new benefit option and/or survivor.'" AR at 153.

potential major purchase, Sloma sought assurance from DRS that his re-retirement benefit would be re-based using his County salary. From telephone conversations between Sloma and DRS during late June or early July 2015, Sloma understood that his Thurston County salary would be included in the calculation of his new retirement benefit, estimated at $6,110 per month.

On or about July 9, 2015, Sloma requested a written estimate of his PERS benefit if he retired from Thurston County in October 2015. DRS staff preparing Sloma's requested estimate became aware of his 2004 election into the post-30-year program. The resulting estimate of his new retirement benefit did not include his Thurston County salary in the AFC factor. Instead, that factor reverted to the AFC that had been used for his 2004 retirement benefit.

A DRS Plan Administrator called Sloma to discuss the benefit estimate. Without the additional monthly benefit, he and his wife felt forced to cancel the purchase of their waterfront home. The Plan Administrator followed up with his conversation with Sloma by sending him a letter explaining that Sloma's enrollment in the post-30-year program limited DRS's authority to recalculate Sloma's AFC to include only earnings prior to Sloma's election.

Sloma retired from his position with Thurston County effective October 31, 2015.

IV. REVIEW & APPEAL

Sloma petitioned for internal review of DRS's refusal to adjust the calculation of his PERS retirement benefit with a higher AFC reflecting his salary during his employment with Thurston County. In a decision issued March 10, 2016, a petitions examiner for DRS concluded that in calculating Sloma's 2015 retirement benefit, DRS correctly excluded his Thurston County salary from his AFC.

Sloma filed a notice of appeal with the Department requesting a hearing to pursue his claim for an adjusted PERS Plan 1 retirement benefit based on an AFC reflecting his higher earnings from Thurston County. DRS filed a motion for summary judgment. The Presiding Officer ultimately granted DRS' motion for summary judgment. The Presiding Officer concluded,

> Having made an irrevocable election to participate in the PERS plan 1 post-30-year program with his first retirement, [Sloma], after re-entering active PERS membership in post-retirement PERS-covered employment, and retired again, is not entitled to a re-retirement benefit calculated with an AFC component reflecting the increased salary earned in his post-retirement employment. In his situation equitable estoppel will not sustain his claim for an increased retirement benefit.

AR at 20.

Sloma filed a petition for judicial review of the final order in superior court. The superior court affirmed the final order. Sloma now appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

We review a final agency order under RCW 34.05.570(3). In reviewing an administrative action, we sit in the same position as the trial court and apply the Administrative Procedure Act[3] standards directly to the agency's administrative record. *Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus.*, 112 Wn. App. 291, 296, 49 P.3d 135 (2002). We review summary judgment de novo. *Wash. Educ. Ass'n v. Dep't of Ret. Sys.*, 181 Wn.2d 233, 241, 332 P.3d 439 (2014). Summary judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. CR 56(c).

---

[3] Ch. 34.05 RCW.

II. STATUTORY INTERPRETATION

Sloma argues that RCW 41.40.191 should be interpreted to apply only to a member's initial retirement and to have no impact on that member's subsequent retirement should he return to PERS membership. We disagree.

When interpreting a statute, our fundamental objective is to ascertain and give effect to the legislature's intent. *Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d 393, 405, 377 P.3d 199 (2016). Our inquiry begins with the plain meaning of the statute. *Lenander*, 186 Wn.2d at 405. "In doing so, we consider the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." *Lenander*, 186 Wn.2d at 405. If the meaning of the statute is plain on its face, then we must give effect to that meaning. *Lenander*, 186 Wn.2d at 405.

A.    *Plain Language Supports the Department's Final Order*

Sloma contends that we should construe RCW 41.40.191 in his favor. "Courts liberally construe ambiguous pension legislation to favor beneficiaries." *Hahn v. Dep't of Ret. Sys.*, 137 Wn. App. 933, 943-44, 155 P.3d 177 (2007). But if, as here, a statute is unambiguous, its meaning may be derived from the language of the statute alone. *Chancellor v. Dep't of Ret. Sys.*, 103 Wn. App. 336, 342, 12 P.3d 164 (2000).

RCW 41.40.191 governs the post-30-year program and provides:

A member may make the *irrevocable* election under this section no later than six months after attaining thirty years of service. The election shall become effective at the beginning of the calendar month following department receipt of employee notification.
      (1) The sum of member contributions made for periods of service after the effective date of the election plus seven and one-half percent interest shall be paid

9

to the member at retirement without a reduction in the member's monthly retirement benefit as determined under RCW 41.40.185.

(2) *Upon retirement, the member's benefit shall be calculated using only the compensation earnable credited prior to the effective date of the member's election.* Calculation of the member's average final compensation shall include eligible cash outs of sick and annual leave based on the member's salary and leave accumulations at the time of retirement, except that the amount of a member's average final compensation cannot be higher than if the member had not taken advantage of the election offered under this section.

(Emphasis added).

Sloma argues that RCW 41.40.191 applies only to a member's first retirement because the statute is silent about any effect on subsequent retirements. We disagree with his interpretation.

The plain language of the statute unambiguously states that an election under RCW 41.40.191 is irrevocable. A PERS 1 member who achieves 30 years of service has one window of opportunity to elect into the post-30-year program, and if they do so, their retirement benefit shall be calculated using only the compensation earned prior to the effective date of their election. RCW 41.40.191. The statute does not limit the effect of the election to a member's first retirement. Indeed, the election is not tied to retirement, but becomes available to members when they achieve a particular service status.

Interpreting the statute to have no bearing on a future re-retirement would render the statute's use of "irrevocable" meaningless as it would allow a member to effectively revoke his irrevocable election by returning to PERS membership. The plain language of the statute is clear that the irrevocable election into the post-30-year program applies to any calculation of the member's retirement benefit, whether it be his first retirement or a subsequent retirement.

10

Sloma contends that this interpretation of RCW 41.40.191 conflicts with the statutes governing re-entry into PERS membership and subsequent re-retirement, specifically RCW 41.40.023, RCW 41.40.037(3), and RCW 41.40.010(6)(a). But Sloma fails to identify any such conflict. Rather, these statutes are complementary, raising no contradictions that require harmonization.

RCW 41.40.023 governs eligibility for PERS membership. RCW 41.40.023(12) specifically addresses PERS retirees and provides, in relevant part, that "following reemployment in an eligible position, a retiree may elect to prospectively become a member of the retirement system if otherwise eligible." RCW 41.40.037(3) governs how membership benefits are managed in the event a retiree re-establishes membership and provides:

> If the retiree opts to reestablish membership under RCW 41.40.023(12), he or she terminates his or her retirement status and becomes a member. Retirement benefits shall not accrue during the period of membership and the individual shall make contributions and receive membership credit. Such a member shall have the right to again retire if eligible in accordance with RCW 41.40.180. However, if the right to retire is exercised to become effective before the member has rendered two uninterrupted years of service, the retirement formula and survivor options the member had at the time of the member's previous retirement shall be reinstated.

RCW 41.40.010(6)(a) defines AFC for PERS 1 members to be "the annual average of the greatest compensation earnable by a member during any consecutive two year period of service credit months for which service credit is allowed."

These statutes govern distinct aspects of PERS 1 retirement, benefit calculation, reemployment, and re-retirement and do not conflict with RCW 41.40.191, which pertains only to a member's opportunity to elect into the post-30-year program and the effects of any such election. These four statutes apply in harmony to govern the retirement benefits and PERS

membership of a member who achieves 30 years of service, retires, reestablishes membership, and re-retires.

For example, because Sloma elected into the post-30-year program, his retirement benefit was calculated, in part, by using the definition of AFC in RCW 41.40.010(6)(a) and using the compensation he earned prior to the effective date of the election, as required by RCW 41.40.191. Then, when Sloma returned to a PERS eligible position, RCW 41.40.023 governed his eligibility for PERS membership. Finally, having chosen to reestablish PERS membership, Sloma's subsequent participation in PERS was governed by RCW 41.40.037. Contrary to Sloma's contention, these statutes do not conflict.

B.    *The Administrative Code Does Not Support Sloma's Interpretation*

Sloma also contends that the administrative code supports his interpretation of RCW 41.40.191. He contends that WAC 415-108-710(6) requires that his AFC be recalculated at a higher rate upon re-retirement. But WAC 415-108-710(6)(b) provides simply that "[i]f you reenter PERS membership and later choose to retire again, DRS will recalculate your retirement allowance *under the applicable statutes and regulations*." (Emphasis added). For a PERS 1 member who elects into the post-30-year program, one of the applicable statutes is RCW 41.40.191.

Sloma also argues that because no administrative rules or DRS publications address RCW 41.40.191's application to re-retirement, the most reasonable interpretation is that the statute is limited to a first retirement. But we determine the intent of the legislature primarily from the statutory language. *In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011). And if statutory language is plain on its face, as it is here, we will not reach or consider

12

agency interpretation of the statute. *See Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 715-16, 153 P.3d 846 (2007). If anything, the silence of agency rules on RCW 41.40.191's application suggests that the legislature's intent in RCW 41.40.191 is clear on its face.

C.      *DRS Advice Is Irrelevant to Our Statutory Interpretation*

Sloma also seems to suggest that Sparkles's communications with him support his interpretation of RCW 41.40.191. But, again, we determine the intent of the legislature primarily from the statutory language. *Schneider*, 173 Wn.2d at 363. We have "the ultimate authority to determine the meaning and purpose of a statute." *Lindeman v. Kelso School Dist. No. 458*, 162 Wn.2d 196, 201, 172 P.3d 329 (2007). Sparkles's comments have no bearing on our determination of the legislative intent behind RCW 41.40.191.[4]

Accordingly, we hold that the Department properly interpreted RCW 41.40.191 to apply to Sloma's re-retirement.

### III. CONSTITUTIONAL CONTRACT RIGHTS

Sloma also argues that applying RCW 41.40.191 to deny him a recalculated AFC is unconstitutional because it substantially impairs his public pension contract rights. We disagree.

We review constitutional issues de novo. *Lenander*, 186 Wn.2d at 403. We presume that a statute is constitutional and place the burden of showing unconstitutionality on the challenger. *Lenander*, 186 Wn.2d at 403.

---

[4] Sloma also implies that because his re-enrollment form when he rejoined PERS membership had no area to alert DRS that he had previously elected into the post-30-year program, the election must be limited to a first retirement. Sloma points to no authority for the premise that an agency form would govern or even inform our statutory interpretation. Moreover, because the statutory language of RCW 41.40.191 is plain on its face, our inquiry ends there.

Article I, section 23 of the Washington Constitution provides that "[n]o . . . law impairing the obligations of contracts shall ever be passed." *See also* U.S. CONST. art. I, § 10 ("No State shall . . . pass any . . . law impairing the obligation of contracts."). We give these provisions of the federal and state constitutions the same effect in Washington. *Wash. Educ. Ass'n*, 181 Wn.2d at 242.

PERS is a comprehensive system of pension benefits for qualifying state employees. *Wash. Educ. Ass'n v. Dep't of Ret. Sys.*, 181 Wn.2d 212, 217, 332 P.3d 428 (2014). "A public employee's right to a pension is 'a vested, contractual right based on a promise made by the State at the time an employee commences service.'" *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 65, 847 P.2d 440 (1993) (quoting *Wash. Fed'n of State Emps. v. State*, 98 Wn.2d 677, 683, 658 P.2d 634 (1983)). Although we give some deference to the legislature when a private contract is impaired, we apply a more stringent review of state action that impairs a public contract. *Wash. Educ. Ass'n*, 181 Wn.2d at 242.

In evaluating the impairment of public contracts, we apply a three-part test. *Lenander*, 186 Wn.2d at 414. Under this test, we ask: (1) does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is substantial impairment, is the impairment reasonable and necessary to serve a legitimate public purpose? *Lenander*, 186 Wn.2d at 414. In public pension contract impairment cases, our application of the three-prong test is guided by the principles set forth in *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956). There, our Supreme Court held that any modifications to an employee's public pension contract terms must be for the sole purpose of ensuring the continued flexibility and integrity of the pension system, and any modifications that have the effect of

14

reducing a pension benefit or have an adverse effect on members must be counterbalanced by a corresponding increase or additional benefit. *Bakenhus*, 48 Wn.2d at 701-02.

Here, Sloma contends that RCW 41.40.191 is unconstitutional because it negatively modifies his pension rights without offering a corresponding benefit. He claims a vested right to have his AFC recalculated to include his salary from Thurston County. But RCW 41.40.191 does not remove or impair any benefits from members like Sloma. Rather, it establishes an option for PERS 1 members to be refunded their employee contributions after 30 years of service. RCW 41.40.191 does not require members to elect into the program; nor does it prevent members from reentering PERS membership after retirement. To the extent that RCW 41.40.191(2)'s provision that a member who elects into the post-30-year program shall have his AFC calculated using only his compensation prior to the election has the effect of reducing what he otherwise could have received in pension benefits, the refund of the member's contributions with interest constitutes a corresponding benefit.

For some members, electing into the post-30-year program and receiving a refund would be beneficial, although for others, forgoing a refund of their employee contributions in order to have their post-30-year salary factor into their AFC at retirement would be more financially lucrative. During the election period, members must make a rational calculation as to which path would be best for them.

Here, it was Sloma's decision, not RCW 41.40.191 or DRS that deprived Sloma of the ability to rebase his AFC upon re-retirement. That Sloma's decision to elect into the post-30-

year program ultimately resulted in a lower retirement benefit than if he had not elected does not render RCW 41.40.191 unconstitutional.[5]

IV. ESTOPPEL

Sloma also argues that "[e]stoppel prevents denying [him] a recalculated AFC." Br. of Appellant 41. He intermingles arguments based on equitable estoppel and promissory estoppel, but the two are different doctrines with different elements and applications. *See Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 258-59, 616 P.2d 644 (1980) ("Equitable estoppel is based upon a representation of existing or past facts, while promissory estoppel requires the existence of a promise."). Accordingly, we address the two doctrines separately. We hold that neither equitable estoppel nor promissory estoppel entitles Sloma to relief.

A.      *Equitable Estoppel*

"Equitable estoppel prevents a party from taking a position inconsistent with a previous one where inequitable consequences would result to a party who has justifiably and in good faith relied thereon." *Byrd v. Pierce County*, 5 Wn. App. 2d 249, 258, 425 P.3d 948 (2018).

Equitable estoppel against the government is disfavored. *Byrd*, 5 Wn. App. 2d at 258.

> When equitable estoppel is asserted against the government, the party asserting estoppel must establish five elements by clear, cogent, and convincing evidence: (1) a statement, admission, or act by the party to be estopped, which is inconsistent with its later claims; (2) the asserting party acted in reliance upon the statement or action; (3) injury would result to the asserting party if the other party were allowed to repudiate its prior statement or action; (4) estoppel is 'necessary to prevent a manifest injustice'; and (5) estoppel will not impair governmental functions.

---

[5] Sloma dedicates a portion of his brief to arguing that his "pension rights were not waived." See Br. of Appellant 38. However, DRS does not contend that Sloma's pension rights were waived.

*Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 887, 154 P.3d 891 (2007) (plurality opinion) (quoting *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993)).

More importantly, equitable estoppel is not available for use as a "sword," or cause of action by plaintiffs. *Motley-Motley, Inc. v. Pollution Control Hearings Bd.*, 127 Wn. App. 62, 73, 110 P.3d 812 (2005). Equitable estoppel is properly used as a "shield," or a defense. *Klinke*, 94 Wn.2d at 259. Here, Sloma misplaces his reliance on the equitable estoppel doctrine by attempting to use it as a sword to compel DRS to recalculate his AFC based on the compensation he earned after he made his irrevocable election under RCW 41.40.191. Because equitable estoppel cannot be the basis for a cause of action, Sloma cannot invoke it here.

B.  *Promissory Estoppel*

Promissory estoppel requires (1) a promise (2) where the promisor reasonably expected to cause the promisee to change his position, (3) which in fact did cause the promisee to change his position (4) by justifiably relying on the promise in such a manner (5) that injustice can be avoided only by enforcement of the promise. *Jones v. Best*, 134 Wn.2d 232, 239, 950 P.2d 1 (1998). "Promissory estoppel requires the existence of a promise" that is "clear and definite." *Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 172-73, 876 P.2d 435 (1994). Washington courts have adopted the *Restatement's* definition of "promise": "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981); *Wash. Educ. Ass'n*, 181 Wn.2d at 225.

Here, Sloma's promissory estoppel claim fails on the first element because Sparkles's correspondence with Sloma did not make a clear and definite promise. Sparkles told Sloma "any compensation you earn after returning to membership will be reviewed when determining your 24-month AFC at time of re-retirement." AR at 153. Sloma responded to clarify that there was no minimum number of months he would need to work in order for his new salary to be considered in his AFC calculations upon re-retirement. Sparkles responded that "after returning to active membership it doesn't matter how long you work and then re-retire to have the new compensation and service credits counted towards recalculating your new AFC for re-retirement." AR at 152.

Sparkles's statements did not constitute a "manifestation of intention to act . . . in a specified way," as required to form a promise. RESTATEMENT (SECOND) OF CONTRACTS § 2(1). Rather, her comments were general information and guidance as to how later compensation is considered at re-retirement. Sparkles said that Sloma's new compensation would be "reviewed" upon re-retirement but did not promise that the new compensation would necessarily result in a new AFC.

Sloma's claim also fails because he cannot show that he changed his position in reliance on Sparkles's comments. The e-mails Sloma relies on occurred on May 4 and 8. But Sloma's appointment to the Thurston County position was confirmed on April 12, and his first day of work was May 1. Although Sloma may have subjectively believed he would be able to rebase

18

his AFC upon re-retirement, the record does not support his claim that his decision to accept the Thurston County position turned on DRS's communications with him.[6]

Accordingly, we hold that neither equitable estoppel nor promissory estoppel entitle Sloma to the relief he seeks.

## V. ATTORNEY FEES

Sloma seeks an award of statutory attorney fees and costs under RAP 18.1 and RCW 4.84.010. RCW 4.84.010(6) permits statutory attorney fees to the prevailing party upon judgment. Because we affirm, Sloma is not the prevailing party and, therefore, not entitled to statutory attorney fees and costs.

## VI. CONCLUSION

In conclusion, we hold that (1) under the plain language of RCW 41.40.191, Sloma's re-retirement benefit was properly calculated using only the compensation he earned prior to the effective date of his irrevocable election; (2) RCW 41.40.191 did not unconstitutionally impair Sloma's pension rights; (3) equitable estoppel is not available to Sloma as a means to compel DRS to re-calculate his retirement benefit based on his Thurston County salary; (4) Sloma fails to prove the existence of a promise or reliance for the purposes of promissory estoppel; and (5)

---

[6] Although Sloma mentions that he attempted to purchase a house because he relied on the State's representations, he does not specifically argue that this purchase and sale agreement was a change in position for purposes of promissory estoppel.

No. 53054-6-II

Sloma is not entitled to attorney fees.[7] Accordingly, we affirm the decision of the superior court affirming the Department's final order.

Worswick, J.

We concur:

Lee, A.C.J.

Cruser, J.

---

[7] Sloma noted two additional assignments of error—that the DRS order was not supported by substantial evidence and that the DRS order was arbitrary and capricious. But Sloma does not support his assignments of error with argument or authority; thus, they are waived. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).