# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 1 4 2014

_for_ CHIEF JUSTICE

This opinion was filed for record
at _8:00 AM_ on _Aug 14, 2014_

Ronald R. Carpenter
Supreme Court Clerk



## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WASHINGTON EDUCATION ASSOCIATION; KATHIE AXTELL; STACIA BILSLAND; LISA BRACKIN-JOHNSON; RANDY JENSON; JARED KINK; SUSAN LEAVEL; SHEILA NOKES; CINDY ROAF; DEBBIE ROSE; and all others similarly situated, | ) ) ) ) ) ) ) ) ) | No. 87424-7 |
| Respondents/Cross-Appellants, | ) ) | |
| v. | ) ) | En Banc |
| WASHINGTON DEPARTMENT OF RETIREMENT SYSTEMS; STATE OF WASHINGTON, | ) ) ) ) ) | |
| Appellants/Cross-Respondents. | ) ) | |
| CHERYL COSTELLO; STEPHEN GORE; RICHARD MORVAN; JERALD NEWELL; DAVID RENO; and FINN LIVINGSTON on behalf of themselves and a class of persons similarly situated, | ) ) ) ) ) ) | |
| Respondents/Cross-Appellants, | ) ) | |
| v. | ) ) | |
| WASHINGTON DEPARTMENT OF RETIREMENT SYSTEMS; STATE OF WASHINGTON, | ) ) ) ) ) | Filed ____AUG 1 4 2014____ |
| Appellants/Cross-Respondents. | ) ) | |

WASHINGTON PUBLIC EMPLOYEES )
ASSOCIATION, UFCW LOCAL 365, on )
behalf of the individual employees it )
represents, )
)
Plaintiffs, )
)
v. )
)
DEPARTMENT OF RETIREMENT )
SYSTEMS; STATE OF WASHINGTON, )
)
Defendants. )
_____)
WASHINGTON FEDERATION OF STATE )
EMPLOYEES; PAULETTE THOMPSON; )
DANA HUFFORD; and DON HEWITT, )
)
Respondents/Cross-Appellants, )
)
v. )
)
DEPARTMENT OF RETIREMENT )
SYSTEMS; STATE OF WASHINGTON, )
)
Appellants/Cross-Respondents. )
_____)

MADSEN, C.J.—The legal issue presented here is whether the legislature's 2007

repeal of gain sharing—a pension enhancement provided in years of extraordinary

investment return—unconstitutionally impairs the contract between the State and its

employees. The companion case, *Washington Education Ass'n v. Department of

Retirement Systems*, No. 88546-0 (Wash. Aug. 14, 2014) (*WEA* I), presents the same

issue, and we reach the same conclusion. As in the companion case, we hold that the

legislature reserved its right to repeal a benefit in the original enactment of that benefit

and the enactment did not impair any preexisting contractual right. As to the employees' alternative argument, which is raised only in this case, we hold that the explanatory materials provided by the Department of Retirement Systems (DRS) do not rise to the level of making a promise or creating an inconsistent statement and thus reject the employees' contention that the state is estopped from repealing the gain-sharing benefit at issue in this case. Accordingly, we reverse the trial court's award of summary judgment to the employees.

## FACTS AND PROCEDURAL HISTORY

Washington offers a comprehensive system of pension benefits for qualifying state employees. Most regularly compensated state employees and elected officials qualify for the Public Employees' Retirement System (PERS). Certified public school teachers qualify for the Teachers' Retirement System (TRS), while "classified" (noncertified) school district staff receive benefits under the School Employees' Retirement System (SERS). There are three different pension plans, and benefits offered by Plans 1, 2, and 3 are consistent across the three systems.[1] Plan 1 is a defined benefit plan where members receive a fixed monthly pension amount regardless of the amount they actually contribute during employment. Employee contribution rates are fixed by statute, and employers contribute the amount needed to make up the difference between employee contribution, investment gains or losses, and the monthly payments promised to employees. Plan 3, alternately, is a hybrid pension plan with defined benefit and contribution components.

---

[1] Employees in PERS and TRS fall into either Plan 1, Plan 2, or Plan 3. Because SERS was not created until 1998 (after Plan 1 was eliminated for new employees), SERS employees are divided between Plan 2 and Plan 3.

3

The defined benefit portion is funded exclusively through employer contributions and the investment returns thereon. For the defined contribution portion, the employee chooses the contribution rate upon joining and controls the investment of the funds. The gain-sharing program at issue here applied to members of Plan 1 and Plan 3 of PERS and TRS and Plan 3 of SERS.[2]

The economic boom of the 1990s sparked many years of extraordinary investment gains. State employers benefited significantly from this spike because their contribution rates for Plans 1 and 3 automatically adjusted downward to reflect the extra cash flow. But because employee contribution rates were fixed, the employees did not receive the same benefit. The legislature decided to share some of the upside with employees and passed the gain-sharing program in 1998. LAWS OF 1998, chs. 340 (PERS 1 and TRS 1), 341 (TRS 3 and SERS 3); LAWS OF 2000, ch. 247 (PERS 3). Under gain sharing, when investment returns exceeded 10 percent over the course of four consecutive years, a portion of the excess was distributed to member employees. Former RCW 41.31.020 (2006) (Plan 1); former RCW 41.31A.020 (2006) (Plan 3). Plan 1 members received their gain-sharing benefit as an increase to their postretirement annual cost of living adjustments (COLAs). Former RCW 41.31.010 (2006). Plan 3 members received gain sharing as a lump sum credit to their pension accounts. Former 41.31A.020.[3]

---

[2] Gain sharing did not apply to Plan 2 because Plan 2 members' contribution rates adjusted downward in times of extraordinary investment gain. Thus, they reaped the benefits of the surplus automatically.

[3] With a few exceptions, only Plan 3 members who had accumulated at least $1,000 in their member accounts could qualify for gain-sharing disbursements. Former RCW 41.41A.020(2).

Because the Office of the State Actuary was uncertain of gain sharing's long-term impact on the pension system and believed the program may need to be revised over time, the legislature expressly reserved its right to amend or repeal gain sharing. The Plan 1 provision stated, "The legislature reserves the right to amend or repeal this chapter in the future and no member or beneficiary has a contractual right to receive this postretirement adjustment not granted prior to that amendment or repeal." Former RCW 41.31.030 (2006). The Plan 3 provision contained a substantially similar reservation clause. Former RCW 41.31A.020(4).

Since passage of the gain-sharing provision in 1998, gain-sharing events have occurred twice, once in 1998 and once in 2000. In 1998, gain sharing increased Plan 1 members' COLAs by 10 cents. Former RCW 41.31.020(2). In 2000, gain sharing boosted Plan 1 COLAs by 28 cents. In sum, these two gain-sharing events augmented Plan 1 members' COLAs by $924 million. Plan 3 members received $134.43 per year of service from the 1998 gain-sharing event, generating a $28 million expenditure. The 2000 gain-sharing event paid $254.23 per year of service to Plan 3 members for a total disbursement of $73 million. The average Plan 3 member received $709.49 in 1998 and $2,051.52 in 2000 from these gain-sharing events.[4]

After the boom of the 1990s, the economy slowed and the legislature began to reexamine its gain-sharing policy. Because employee contribution rates in Plans 1 and 3

---

[4] Because SERS 3 and PERS 3 were not created until after the 2000 gain-sharing distribution, the Plan 3 members included in these sums were all TRS 3 members. The legislature extended a supplemental gain-sharing distribution equivalent to the 2000 payment for all PERS 2 members who transferred to PERS 3. LAWS OF 2000, ch. 247.

were fixed, it became necessary to increase employer contribution rates after gain-sharing events to accommodate years of poor investment returns. In 2002, the legislature appointed a new state actuary. This new actuary quantified the monetary impact of gain-sharing and recommended that employer contribution rates be increased in anticipation of future gain-sharing liabilities. The legislature directed a study of its options and ultimately decided to repeal gain sharing in 2007. LAWS OF 2007, ch. 491. The 2007 act eliminated gain sharing for employees hired after July 1, 2007 and discontinued gain sharing for existing employees as of January 2, 2008. This structure allowed existing employees to collect a gain-sharing benefit scheduled for January 1, 2008. Additionally, benefits already paid under the 1998 and 2000 gain-sharing events were not reclaimed. The 2007 act also enacted "replacement benefits" for members of each class. Plan 1 members received an increase in their COLAs, some Plan 2 and 3 members were allowed early retirement, and newly hired TRS and SERS members were allowed to choose between Plans 2 and 3, instead of being forced into Plan 3.

The Washington Education Association, the Washington Federation of State Employees, the Washington Public Employees Association, and an unaffiliated group of employees (the Costello group) filed lawsuits against the State in King County Superior Court.[5] The plaintiffs challenged the 2007 repeal of gain sharing, contending the repeal unconstitutionally impaired their employment contracts with the State in violation of article I, section 23 of the Washington Constitution and article I, section 10 of the United States Constitution. Alternatively, the plaintiffs alleged that the repeal violated the due

---

[5] The Washington Public Employees Association eventually withdrew their suit.

process clause, that the legislature was estopped from repealing gain sharing, and that the repeal breached a unilateral contract.

The trial court consolidated the actions and bifurcated the issues. Phase one considered the legality of the repeal; the trial court granted summary judgment to the plaintiffs and held the repeal violated the contracts clause of the state and federal constitutions. Phase two considered whether, given the unconstitutionality of the repeal, the State was required to maintain the replacement benefits provided by the repeal legislation. Here the trial court granted summary judgment to the State and canceled the replacement benefits. This court granted direct review after receiving petitions from both parties.

## DISCUSSION

As an issue of law, summary judgment is reviewed de novo. *Retired Pub. Emps. Council of Wash. v. Charles*, 148 Wn.2d 602, 612, 62 P.3d 470 (2003). This court presumes that statutes are constitutional as enacted. For the employees to prevail, therefore, they must establish that "there is no reasonable doubt that the statute violates the constitution." *Larson v. Seattle Popular Monorail Auth.*, 156 Wn.2d 752, 757, 131 P.3d 892 (2006).

*1. Impairment of Contract*

The employees argue that they have a constitutionally protected right to continued gain sharing under this court's decision in *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956). They contend this court cannot give effect to that part of the statute

reserving the right to amend or repeal gain sharing. Finally, they argue that under *Bakenhus*, the 2007 act substantially impaired the retirement benefits of employees because the repeal was not necessary to maintain the flexibility or integrity of the system and the replacement benefits provided were not comparable to the gain-sharing benefits that were repealed. Resp'ts' Br. and Cross Appellants' Br. at 20-45.

This court addresses an identical legal issue in *WEA* I. That case concerns the legislature's 2011 repeal of the uniform cost of living adjustment (UCOLA) program. Enacted by the legislature in 1995, UCOLA replaced a prior system of ad hoc COLAs with an automatic grant of annual COLAs based on a statutorily calculated increase amount per year of service. LAWS OF 1995, ch. 345. As with gain sharing, the legislature expressly reserved its right to modify or repeal UCOLA in the future. In fact, the reservation language is almost indistinguishable: "The legislature reserves the right to amend or repeal this section in the future and no member or beneficiary has a contractual right to receive this postretirement adjustment not granted prior to that time." Former RCW 41.32.489(6) (2010); former RCW 41.40.197(5) (2010). Faced with declining economic conditions similar to those that motivated the repeal of gain sharing, the legislature decided to exercise its reserved right and repealed UCOLA in 2011. LAWS OF 2011, ch. 362, § 1. A class of public employee unions and unaffiliated employees challenged the 2011 repeal of the UCOLA program as an unconstitutional impairment of contract.

Because the facts and legal issues between the companion cases are so similar, our decision here follows the analysis we outline in *WEA* I.

*WEA* I holds that the three-prong test adopted in *Carlstrom v. State*, 103 Wn.2d 391, 694 P.2d 1 (1985), applies to public pension cases as well as other public contract impairment cases but that the pension-specific principles outlined in *Bakenhus* inform its application in the pension context. *WEA* I, slip op. at 10-11. These three prongs consider (1) whether a contractual relationship exists, (2) whether legislation has substantially impaired that contractual relationship, and (3) if so, whether the impairment is reasonable and necessary to serve a legitimate public purpose. *Id.* at 10. Just like the parties in this case, the respondents in *WEA* I claimed that the 2011 repeal of the UCOLA program impaired their contract rights with the State. But as we explain, the 1995 creation of the UCOLA program also provided for its repeal. The repeal of UCOLA could never substantially impair existing contractual rights because a repeal of the program was expressly anticipated by the language of the contract. We therefore reason that the respondents' contract rights were impaired, if at all, by the creation of the UCOLA program in 1995 and the legislature's inclusion of a reservation clause in that statute. *Id.* at 11-12.

When addressing whether the creation of the 1995 UCOLA impaired any existing contract rights, this court focuses on the second prong of *Carlstrom*—substantial impairment. *Id.* at 17-19. In *WEA* I, we hold that the *Bakenhus* requirements of implied consent and comparable new advantages define whether legislation substantially impairs

existing contract rights in the public pension context. *Id.* at 17. In this way, *Bakenhus* remains the driving force of our analysis, though we properly confine it within the three-prong backbone of *Carlstrom*. We also hold that the reservation clause is enforceable because it is "an express provision of the statute that created the claimed pension right," and enforcement is consistent with this court's case law and rules of statutory construction. *Id.* at 12-15.

As in *WEA* I, the parties here frame the issue as a challenge to the constitutionality of the 2007 repeal of the gain-sharing program. However, the repeal of gain-sharing cannot impair any existing contractual right because the express language of the gain-sharing statute provided for its repeal. The parties are in fact arguing over the enforceability of the reservation clause contained in the original gain-sharing legislation. The employees' contract rights were impaired, if at all, by the legislature's 1998 enactment of the gain-sharing program and its reservation of the right to amend or repeal the program in the future.

Properly framed, it is obvious that gain sharing did not impair the employees' preexisting contract rights. The first prong of the *Carlstrom* analysis asks whether gain sharing became part of the parties' employment contract, which it clearly did. Whether the gain-sharing provision, in particular the reservation clause, substantially impaired any existing contractual rights is addressed under *Carlstrom*'s second prong. As explained in *WEA* I, the reservation clause contained in the gain-sharing statute is enforceable. *WEA*

I, slip op. at 12-15. The legislature is allowed to condition its grant of pension enhancements using express language in the statutory provision that creates the right.

In pension cases, whether legislation substantially impairs a public contract depends on whether new legislation created comparable new advantages and whether the employees impliedly consented to the modifications. *WEA* I, slip op. at 17-19. Here, the employees impliedly consented to the gain-sharing program, including its reservation clause, because gain sharing was a favorable addition to their employment contract. When the legislature instituted gain sharing in 1998, it did not replace any similar preexisting rights. Rather, gain sharing was a gratuitous addition to employees' retirement packages. In this way, gain sharing, even more so than UCOLA and in spite of its reservation clause, represented a favorable modification to the employees' contract with the State. Thus, the employees impliedly consented to the modification and gain sharing, as defined by the statute that created it, which then became part of their employment contract. In other words, gain sharing provided new advantages to employees compared to their prior benefits because gain sharing was *all* advantage.

In sum, although gain sharing did become part of the employees' contract with the State, the institution of gain sharing did not substantially impair those contract rights because the employees impliedly consented to the favorable addition, including the enforceable reservation clause. Because we resolve this issue on the second prong of *Carlstrom*, we need not consider the third prong of whether the impairment was reasonable and necessary to achieve a legitimate public purpose.

11

*2. Estoppel*

Alternately, the employees contend that principles of estoppel preclude repeal of gain sharing. They argue that employees reasonably relied on DRS handbooks and other DRS communications, which made no mention of the legislature's reserved right to repeal, and thus both promissory and equitable estoppel apply.

Promissory estoppel requires satisfaction of five elements:

> "(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise."

*Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 171-72, 876 P.2d 435 (1994) (alteration in original) (internal quotation marks omitted) (quoting *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259 n.2, 616 P.2d 644 (1980)). Importantly, "[p]romissory estoppel requires the existence of a promise" that is "clear and definite." *Id.* at 172. This court has adopted the *Restatement* definition of promise: "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981).

The DRS communications did not promise a perpetual right to gain sharing. The employees point to language in the DRS handbooks issued regularly to employees that explained that gain sharing "'will be passed on'" if there are extraordinary investment returns. Resp'ts' Br. and Cross Appellants' Br. at 11-12 (emphasis omitted).

Additionally, the employees highlight DRS booklets designed to help employees choose between Plan 2 and Plan 3. They contend that DRS used the promise of gain sharing to incentivize employees to choose Plan 3. *Id.* at 10-11. DRS stipulates that none of its communications with employees warned of the legislature's reserved right to amend or repeal gain sharing. But the absence of a warning and the equivocal description that gain sharing will be paid does not create a clear and definite promise of everlasting gain-sharing rights. Furthermore, all of the DRS handbooks contained qualifying statements advising employees to consult the statute for a fuller description of rights. For example, the PERS 3 handbook states:

> The actual rules governing your benefits are contained in state retirement laws. This handbook is a summary, written in less legalistic terms. It is not a complete description of the law. If there are any conflicts between what is written in this handbook and what is contained in the law, the applicable law will govern.

Clerk's Papers (CP) at 1129; *see also* CP at 1083 (TRS 1), 2782 (SERS 3). The materials provided to aid employees' decision between Plan 2 and Plan 3 contained a similar qualification on the first page. Taken as a whole, these DRS communications did not promise that gain sharing would continue, they merely described how gain sharing would operate. This is not enough to estop the legislature from executing its explicitly reserved right to cancel the program. *See, e.g., Havens,* 124 Wn.2d at 171-75 (holding that there was no clear and definite promise of unending employment simply because an employer failed to inform his employee that employment was terminable at will).

In contrast to promissory estoppel, which is forward-looking, "[e]quitable estoppel prevents a party from taking a position inconsistent with a previous one where inequitable consequences would result to a party who has justifiably and in good faith relied." *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 887, 154 P.3d 891 (2007). Equitable estoppel has five elements:

> (1) a statement, admission, or act by the party to be estopped, which is inconsistent with its later claims, (2) the asserting party acted in reliance upon the statement or action, (3) injury would result to the asserting party if the other party were allowed to repudiate its prior statement or action, (4) estoppel is "necessary to prevent a manifest injustice," and (5) estoppel will not impair governmental functions.

*Id.* (quoting *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993)). Because equitable estoppel is asserted against the government, the employees must establish each of these elements by "clear, cogent, and convincing evidence." *Id.*

The employees fail to prove equitable estoppel because the legislature's repeal of gain-sharing was not "inconsistent with" the highlighted DRS communications. DRS cautioned employees that the statutes, not their handbooks, controlled, and the gain-sharing statute explicitly stated that gain sharing may be repealed in the future. Inconsistency requires a conflict, and the qualifications in the DRS materials prevented such a conflict from occurring. Equitable estoppel does not apply.

### 3. Unilateral Contract

Finally, the employees contend that even if the legislature was not estopped from repealing gain sharing, its decision to do so breached a unilateral contract that promised

14

gain sharing as compensation for continued employment. The employees point to the same DRS communications discussed above as forming the basis for this unilateral contract. Resp'ts' Br. and Cross Appellants' Br. at 30-33.

Our case law does not support the recognition of a unilateral contract on these facts. The employees are correct that this court has enforced unilateral contracts formed by promises made in employee handbooks. *E.g.*, *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 228-29, 685 P.2d 1081 (1984). But, as with promissory estoppel, a unilateral contract requires a promise—termed an offer—evidencing an intent to be bound by its terms, and here the DRS communications were too qualified. *Storti v. Univ. of Wash.*, No. 88323-8, slip op. at 7-8 (Wash. July 24, 2014). Moreover, handbooks that have created enforceable unilateral contracts always outlined employer-specific policies, rather than statutory rights, and were distributed by the direct employer, rather than a state bureaucratic entity like DRS. *E.g.*, *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 826 P.2d 664 (1992); *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 815 P.2d 1362 (1991). The cases cited by the employees do not support their position.

## CONCLUSION

The repeal of gain sharing did not impair any contract rights of employees because the statute enacting gain sharing made provision for its eventual repeal. Further, the original gain-sharing statute did not impair any preexisting rights because the reservation clause is enforceable and employees impliedly consented to the qualified benefit. Finally, doctrines of estoppel and unilateral contract do not provide the relief employees

are looking for. The legislature's repeal of gain sharing must stand. We reverse the trial court.

_Madsen, C. J._

WE CONCUR:

_Johnson, J._

_Owens, J._

_Fairhurst, J._

_Stephens, J._

_Wiggins, J._

_Gonzalez, J._

_Siddoway, J.P.T._

GONZÁLEZ, J. (concurring in result)—I agree with the majority in result. The Washington Legislature specifically reserved the power to repeal gain sharing in the statutes that created the benefit. When the legislature exercised that reserved power in the way that it did, it did not violate the contract clause. I write separately, however, because I do not agree that "gain sharing was a gratuitous addition to employees' retirement packages" or that "the employees impliedly consented" to having it repealed. Majority at 11.

First, we held long ago that pension benefits, including public employee pension benefits, are compensation for work done, *not* gratuities. *Ayers v. City of Tacoma*, 6 Wn.2d 545, 550-51, 108 P.2d 348 (1940) (citing *Bowler v. Nagel*, 228 Mich. 434, 440-41, 200 N.W. 258 (1924)). In *Ayers*, a city comptroller refused to pay public pensions in part on the theory that they were a gift of public funds and unconstitutional under article VIII, section 7 of our constitution.[1] *Id.* at 548, 550. We disagreed and found that the right to a

---

[1] That provision says:
> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

WASH. CONST. art. VIII, § 7.

pension was not a gratuity but was "'in the nature of compensation for services theretofore rendered.'" *Id.* at 551 (internal quotation marks omitted) (quoting *Bowler*, 228 Mich. at 440). The contractual nature of pension rights is woven through our public pension jurisprudence. *E.g.*, *Navlet v. Port of Seattle*, 164 Wn.2d 818, 835, 194 P.3d 221 (2008); *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 698, 296 P.2d 536 (1956) (citing *Luellen v. City of Aberdeen*, 20 Wn.2d 594, 148 P.2d 849 (1944), *overruled on other grounds by Stenberg v. Pac. Power & Light Co.*, 104 Wn.2d 710, 709 P.2d 793 (1985)). The fact that gain sharing was part of the contract for only a set period of time does not change the fact that it was contractual for that time.

Second, in *Bakenhus* itself we flatly rejected the notion that employees impliedly consent to having their pension benefits reduced by continuing to work for an employer after pension reductions are announced. H.D. Bakenhus had been hired as a police officer by the city of Seattle in 1925. *Bakenhus*, 48 Wn.2d at 696. At the time, state law made police officers who met certain requirements eligible for a pension equal to one half their salary the year before their retirement. *Id.* (citing LAWS OF 1909, ch. 39, at 59). In 1937, the legislature capped police officer pensions at $125 per month. *Id.* at 697 (quoting LAWS OF 1937, ch. 24, at 62). Bakenhus retired in 1950, and, based on the 1937 statute, the city paid him only $125 per month. The city of Seattle argued that employees had either impliedly consented to having their pensions

2

reduced by continuing to work for the city after the change was announced or were barred from challenging the reduction under a waiver or estoppel theory. *Id.* at 700-01.[2] In a careful opinion, we rejected the city's many theories. *Id.*

Instead of reaching outside of the arguments presented by the parties in this case to characterize gain sharing in ways they did not, I would simply follow precedent. We have developed a three part test to analyze contract clause challenges to legislation, asking "(1) does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is a substantial impairment, is it reasonable and necessary to serve a legitimate public purpose." *Tyrpak v. Daniels*, 124 Wn.2d 146, 152, 874 P.2d 1374 (1994) (citing *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 403, 869 P.2d 28 (1994)). A separate line of cases establish that any modification of a public pension right (1) must be done to keep the relevant retirement system flexible, (2) must be done to maintain its integrity, and (3) must include counterbalancing benefits for any potential impairment of members' rights. *Bakenhus*, 48 Wn.2d at 701-02. This court began harmonizing the *Bakenhus* line of cases with our traditional contract clause analysis in *Retired Public Employees Council of Washington v. Charles*, 148 Wn.2d 602, 62 P.3d 470 (2003). *Charles* was a challenge to the

---

[2] Counsel suggested at oral argument that *Bakenhus*, properly understood, was a contract clause case because, he contended, it was argued that way to the trial court. While this might have been the complexion of the case before the trial court, it was not analyzed as a contract clause case before this court.

legislature's decision to lower the employer contribution rate in Public Employees' Retirement System Plan 1 and Teachers' Retirement System Plan 1. *Id.* at 609-10. Plaintiffs challenged the reduction as a violation of the contract clause, among many other things. We considered *Bakenhus* (among many other things) in determining the existence and scope of the contract itself. *Id.* at 624 (citing *Bakenhus*, 48 Wn.2d at 701). We did not rest our contract clause analysis solely on *Bakenhus*. *Id.* at 623-28.

What we did impliedly in *Charles*, I would do explicitly today. I would hold that the traditional contract clause analysis applies to contract clause challenges to statutes affecting public employee pension rights. As it was in *Charles*, *Bakenhus* is relevant to our contract clause analysis but does not replace it. *Id.* at 624 (citing *Bakenhus*, 48 Wn.2d at 698-99, 701); *see also Wash. Educ. Ass'n v. Dep't of Ret. Sys.*, No. 88546-0, at 17 (Wash. Aug. 14, 2014).

I would resolve this case simply on step two of the contract clause analysis: whether the repeal of gain sharing substantially impaired the contractual relationship. Like the majority, I would hold that it did not. The original legislation stated that gain sharing could be adjusted or repealed at any time. *E.g.*, LAWS OF 1998, ch. 340, § 3 ("The legislature reserves the right to amend or repeal this chapter in the future and no member or beneficiary has a contractual right to receive this postretirement adjustment not granted prior to

4

that amendment or repeal."), ch. 341, § 312(4). A contractual right is potentially impaired by a statute that alters its terms, imposes new conditions, or lessens its value. *Charles*, 148 Wn.2d at 625 (citing *Wash. Fed'n of State Emps. v. State*, 127 Wn.2d 544, 563, 901 P.2d 1028 (1995)). In this case, the language of the original gain-sharing statutes does not "'evince a legislative intent to create private rights of a contractual nature'" in ongoing gain sharing. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 145, 744 P.2d 1032, 750 P.2d 254 (1987) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n.14, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977)). Given this reservation, the legislature reserved the power to repeal gain sharing, and its exercise of that power did not substantially impair the contractual relationship. *Accord Strunk v. Pub. Emps. Ret. Bd.*, 338 Or. 145, 177-78, 108 P.3d 1058 (2005).

*Bakenhus* is in accord. The threshold issue under *Bakenhus* is whether there is a pension right that has been changed by subsequent legislation. *E.g.*, 48 Wn.2d at 700. If there is a pension right that has been changed, then *Bakenhus* must be satisfied or the contract clause is violated. *See, e.g., Wash. Fed'n of State Emps., AFL-CIO, Council 28 v. State*, 98 Wn.2d 677, 678-79, 658 P.2d 634 (1983). Here, the pension right at issue was the right to gain sharing for as long as the legislature allowed gain sharing. From its inception, the right was subject to the legislature's explicitly reserved power to repeal or

revoke it in the future. *See* LAWS of 1998, ch. 340, § 3, ch. 341, § 312(4); LAWS OF 2000, ch. 247. Given the legislature's statutory reservation, the legislature's subsequent action did not modify any right.

Based on a plain reading of the statutes, there was no promise to gain sharing in perpetuity. Thus, repealing it was not a substantial impairment of the contract under *Tyrpak* or a modification of a pension right under *Bakenhus*. *See Tyrpak*, 124 Wn.2d at 152 (citing *Caritas*, 123 Wn.2d at 403); *Bakenhus*, 48 Wn.2d at 700-01.

With those observations, I respectfully concur in result.

González, J.