IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JEREMY J. MOBERG, | ) | |
| | ) | No. 34390-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TERRAQUA, INC., a/k/a TERRAQUA | ) | UNPUBLISHED OPINION |
| ENVIRONMENTAL CONSULTING; | ) | |
| MICHAEL B. WARD a/k/a MICHAEL B. | ) | |
| WARDSKI; and UNKNOWN | ) | |
| CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | |

SIDDOWAY, J. — Jeremy Moberg sued Terraqua, Inc. for whom he worked for

over a decade, and its owner, Michael Ward. He claims Terraqua misclassified him as an

independent contractor, thereby avoiding the company's financial obligations as an

employer; reneged on oral offers to give him ownership in the company; and delayed for months in delivering his final paycheck. The trial court dismissed his claims on summary judgment. He appeals dismissal of his claims alleging state wage law violations and entitlement to an ownership interest based on theories of promissory estoppel and unjust enrichment.

Terraqua's alleged promises of an ownership interest were too indefinite and Mr. Moberg's evidence of unjust benefit is insufficient to support his promissory estoppel and unjust enrichment claims. But under the test for employee status that we apply to his wage claims—whether, as a matter of economic reality, he was dependent for fish ecology work on Terraqua—material facts are disputed. We reverse dismissal of the wage claims and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

Terraqua is a small business established in 1995 that provides fisheries research and consulting. Michael Ward is its sole owner and principal officer. After working for Terraqua as an intern in college, and then through an employment service firm, Jeremy Moberg began working for Terraqua under a direct contract in 2001. He continued entering into annual contracts with it to serve as a fish ecologist nearly every year until 2011. Terraqua declined to enter into further contracts with Mr. Moberg after the 2010

contract expired on June 30, 2011.

In September 2011, Mr. Moberg sued Terraqua, asserting four claims for relief. One claim, alleging violations of several of Washington's labor laws, was viable only if Mr. Moberg had been an employee of Terraqua. Yet all of Terraqua's contracts with Mr. Moberg characterized him as an independent contractor.

Following the conduct of discovery, Terraqua moved for summary judgment dismissing all of Mr. Moberg's claims. In support, it filed a 49-page declaration of Mr. Ward and much shorter declarations from Holiday Sloan (Mr. Ward's ex-wife and a former co-owner and officer of Terraqua); Mr. Moberg's ex-wife; and three individuals (Joseph Ezell, Loren Doner, and Rueben Miller) who, like Mr. Moberg, had worked for Terraqua under contracts characterizing them as independent contractors. Terraqua's declarations included many attacks on Mr. Moberg as a person and an employee, and addressed the fact that when he was not working for Terraqua, he had other business ventures, including growing marijuana at a time when it was not legal. The declarations of Messrs. Ezell, Doner, and Miller expressed satisfaction with being characterized by Terraqua as independent contractors. Terraqua also presented evidence that Mr. Moberg had spoken favorably in the past of his independent contractor relationship with the company.

Ms. Sloan, who "essentially ran the business" for Mr. Ward between 2007 and 2010, when he took a sabbatical, testified in her declaration as to why Terraqua "used the independent contractor business model":

> Terraqua used the independent contractor business model because it is common in our industry, especially among small businesses, and because it is an easy way to involve multiple people on the same project with minimal coordination effort required and it kept the administrative burden on the individual subcontractors' businesses rather than Terraqua.

Clerk's Papers (CP) at 962, 961.

Mr. Ward's declaration acknowledged that Terraqua's classification and use of independent contractors was examined but not challenged in a 2009 audit by the Internal Revenue Service (IRS). He also acknowledged that after terminating its relationship with Mr. Moberg, Terraqua "transition[ed] to a more employee-dominant business model over the 2011 to 2013 time period." CP at 483. Mr. Ward attributed the company's revised "employment" of workers to growth in Terraqua's business and resulting changes in its administrative needs and demands, rather than to any belief that workers had previously been misclassified. Messrs. Miller and Doner both acknowledged in their declarations that they ceased to be treated as independent contractors by Terraqua in spring 2012, becoming seasonal employees thereafter. Both claimed the change in status went hand-in-hand with changes in their working relationship with Terraqua.

Most important for present purposes is the evidence Mr. Moberg presented in

4

opposition to the motion for summary judgment and whether a jury could reasonably find it supports his contention that he was, in fact, an employee. Mr. Moberg testified that Terraqua's post-2012 "employees" did the same work they did when they were subcontractors and that the company's transition to "employing" the workers is evidence they had been misclassified earlier. But for the most part, his response keyed off this court's 2010 decision in *Anfinson v. FedEx Ground Package System, Inc.*, which held as a matter of first impression that "employ" and "employee" under the Washington Minimum Wage Act (MWA), chapter 49.46 RCW, have the broad "economic reality" meaning applied under the federal Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219. *Anfinson*, 159 Wn. App. 35, 244 P.3d 32 (2010), *aff'd*, 174 Wn.2d 851, 281 P.3d 289 (2012). That meaning has been characterized as "comprehensive enough to require its application to many persons and working relationships, which prior to [the FLSA], were not deemed to fall within an employer-employee category." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51, 67 S. Ct. 639, 91 L. Ed. 809 (1947).

Mr. Moberg's opposition materials addressed the six factor test adopted in *Anfinson*, which is used by a majority of the federal circuits to determine as a matter of economic reality, whether a worker is dependent on the business to which he renders service or is, instead, in business on his own. The six nonexclusive factors are:

(1) the permanence of the working relationship between the parties;
(2) the degree of skill the work entails;

5

(3) the extent of the worker's investment in equipment or materials;

(4) the worker's opportunity for profit or loss;

(5) the degree of the alleged employer's control over the worker;

(6) whether the service rendered by the worker is an integral part of the alleged employer's business.

159 Wn. App. at 52.

On the matter of the *permanence of his working relationship* with Terraqua, Mr. Moberg testified that he worked for Terraqua "for twelve straight years; from 1998 through June of 2011." CP at 422. He testified and provided documentary evidence that Mr. Ward directed him to identify himself in communications with Terraqua's main client, the Bonneville Power Administration (BPA), as Terraqua personnel. He testified that anytime he authored a publication, Mr. Ward insisted he identify himself as working for Terraqua.

He testified that in several of the years he worked for Terraqua, he did so without a written contract. Mr. Ward's own declaration acknowledged having no signed contract with Mr. Moberg for the periods 7/2007-6/2008, 7/2009-6/2010, and 7/2010-6/2011, but stated there had been verbal agreements with Mr. Moberg to extend prior contracts into those periods, including agreement to negotiated increases in Mr. Moberg's hourly rate of pay.

Mr. Moberg testified he never freelanced as a fish ecologist during the period he

worked for Terraqua, performing that work only for Terraqua. He testified that although his contracts stated he had the right to work for others, Mr. Ward made it clear that if Mr. Moberg sought fish ecology consulting work elsewhere, his contract would be terminated, which was Terraqua's prerogative with 14 days' notice.

On the matter of the *degree of skill the work entails*, Mr. Moberg testified that during the field season (spring through fall), he would gather data and manage other employees in the field, while in the off-season, he worked on publications, quantifying and assuring the quality of data, scheduling, budgeting, and other tasks.

On the matter of the *extent of the worker's investment in equipment or materials*, Mr. Moberg testified that Mr. Ward and Terraqua supplied him with all the tools needed to do field work, describing the types of gear provided. He testified he would "routinely purchase this gear for Terraqua on the Terraqua company credit card." CP at 424. Although Mr. Moberg acknowledged owning a computer and using it to do work for Terraqua, he testified that office work was not a significant part of his work for Terraqua, the company paid him to use his computer, and Terraqua supplied him with all of the office supplies he needed for his work. He testified Terraqua paid for all of his training.

On the matter of the *worker's opportunity for profit or loss*, Mr. Moberg testified he was always paid hourly, so there was "no way for me to profit more or experience loss based on efficiency/inefficiency in the work I did . . . . If I worked more hours I would get paid more money . . . like any employee." CP at 425.

7

On the matter of the *degree of the alleged employer's control over the worker*, Mr. Moberg testified he took direction mostly from Mike Ward, but also from Holiday Sloan, as to how to complete his work. He testified:

> I was not free to choose how to allocate my hours. Mike Ward directed me on how to allocate my hours. Often times Mike Ward directed me to change my hours from one billing category to another. Also, I was required to schedule all the field workers and Mike Ward would approve or reject my schedules.

CP at 424. He testified that Mr. Ward "tightly controlled" his hours and often would tell him to stop working for various reasons. CP at 425. He testified that Mr. Ward required that he approve Mr. Moberg's schedule and hours worked. He supported these contentions with electronic mail communications between himself and Mr. Ward.

On the matter of whether the *service he rendered was an integral part of the alleged employer's business*, Mr. Moberg testified that during the years he worked for Terraqua, he was part of a small core group of personnel. The type of services he claimed to have provided, as earlier described (data gathering, field work managing, data analysis and publication, scheduling and budgeting) were described as part and parcel of what Terraqua clients purchased from the company. In Mr. Ward's own declaration, he had described Terraqua as helping client agencies "meet their electrical production and fish and wild life obligations . . . by doing thorough and precise science that is also cost-efficient for our clients." CP at 481.

8

Mr. Moberg's opposition materials demonstrated that during the period he worked for Terraqua, the company had only two employees: its management employees, Mike Ward and Holiday Sloan. He argued that the two employees could not and did not perform the company's core "science" work for clients.

Mr. Moberg also submitted deposition testimony of Ms. Sloan and Mr. Ward in opposition to summary judgment. The testimony, and an exhibit, identified what Ms. Sloan told an IRS auditor in 2009 about the terms of its independent contractors' work for the company. According to Mr. Moberg's opposition materials, much of what Ms. Sloan told the IRS was false. He testified to eight examples of falsehoods.

The deposition testimony established that by the time of Mr. Ward's deposition, Terraqua had gone from treating only Mr. Ward and Ms. Sloan as employees to treating 10 of its workers as employees. Finally, Mr. Ward identified the type of invoice Mr. Moberg was required to submit to get paid for his work for Terraqua, including the mileage and other expenses that he was allowed to have reimbursed by the company.

Reply declarations of Mr. Ward and Ms. Sloan submitted by Terraqua emphasized the less than full-time nature of Mr. Moberg's work for Terraqua, and the fact that Mr. Moberg's billings represented only six percent of Terraqua's gross receipts in his latter years working for the company. Terraqua's counsel argued that Mr. Moberg should not be heard to disclaim seven contracts he signed reciting his independent contractor status,

9

nor should the court ignore the fact that Mr. Moberg filed his income tax returns as self-employed, relying on that status to claim deductions that might not otherwise have been available to him.

Turning to Mr. Moberg's claims that he had been promised by Mr. Ward to be made a "partner" in Terraqua, the defendants offered a transcript of Mr. Moberg's deposition, in which he testified as follows about the alleged promise:

> [There were] conversations about, you know, "If we build this field component, you know, it's a lucrative thing. It's how businesses make money. And, you know, we could—we'll get to a point where we'll make you a partner."
> That was kind of an ongoing theme over the years.

CP at 844.

> It was general. It was an assurance that, as I was growing his company, that I would receive the benefits of that through some sort of partnership ownership. It wasn't really spelled out, it was more of an assurance. It was verbal promises, and I always had the expectation that they would be fulfilled.

CP at 845.

> Well, I don't know what [the partnership ownership] would look like. I had no concept. All I knew was that I had been putting a lot of work into the growth and success of Terraqua and that I would at some point benefit through that through ownership, through solid salaries, and a commitment that I knew that I would continue to work there and continue to grow the company.

CP at 846.

> It was just throughout the—it was throughout the years, on more of a—you know, it was obviously never a formal commitment.

10

CP at 851.

> I don't think people use the word "promise" when they promise something, but I was assured that my extra effort, which was really a lot of work and determination to be successful for Terraqua, that I was encouraged with the proposition—you could call it a promise—that I would at some point have a documented partnership/ownership/employment relationship.

CP at 870.

Terraqua's motion for summary judgment was granted. The trial court concluded in part that Mr. Moberg's independent contractor status while working for Terraqua was not genuinely disputed.

Mr. Moberg appeals the dismissal of the wage related claims he asserts as an employee (claims under the MWA, chapter 49.46 RCW; "Wage Payment Act" (WPA), chapter 49.48 RCW; and "Wage Rebate Act" (WRA), chapter 49.52 RCW, arguing that whether he was Terraqua's employee for those purposes *is* genuinely disputed. He also contends he demonstrated that genuinely disputed facts require trial of his promissory estoppel and unjust enrichment claims.

## ANALYSIS

An order granting summary judgment is reviewed de novo, "considering the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015).

11

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

## I. Claims under State Wage and Hour Laws[1]

The record does not reveal a quantification of overtime wages Mr. Moberg claims not to have been paid, but he did assert a claim for unpaid overtime in opposing summary judgment. Overtime is required by RCW 49.46.130 to be paid to employees working longer than 40 hours in a workweek. As previously observed, the test of employee status for purposes of chapter 49.46 RCW is whether the worker is an employee "as a matter of economic reality" in the sense that "the individual is dependent on the business to which

---

[1] Terraqua makes a preliminary argument that Mr. Moberg's opening brief violates several rules of appellate procedure and we should treat him as having waived all his claims.

Terraqua is correct that Mr. Moberg's opening brief fails to set forth relevant facts. Nonetheless, his briefing is clear that he is appealing the trial court's grant of summary judgment dismissing his state wage and hour, promissory estoppel, and unjust enrichment claims because, he argues, he demonstrated disputed facts that require trial. Given the de novo nature of review of a summary judgment, that points us directly to the parties' affidavits and other evidentiary submissions. "In a case where the nature of the appeal is clear and the relevant issues are argued in the body of the brief and citations are supplied so that the court is not greatly inconvenienced and the respondent is not prejudiced, there is no compelling reason for the appellate court not to exercise its discretion to consider the merits of the case or issue." *State v. Olson*, 126 Wn.2d 315, 323, 893 P.2d 629 (1995).

Terraqua also argues that Mr. Moberg did not allege violations of the MWA or the WPA in his complaint, but the complaint includes a claim for unpaid overtime, *see* CP 1064 at paragraph 26, and in addition to generally alleging a failure to pay wages in violation of state law, *see id.*, cites RCW 49.52.050 and .070 (the WRA), and RCW 49.48.030 (the WPA) as a basis for relief. *See id.* The wage claims were also addressed in the parties' summary judgment briefing. *See, e.g.*, CP at 157, 227-28, 231.

he renders service"—the test applied to claims arising under the FLSA. *Anfinson*, 159 Wn. App. at 51.

Over the years, Mr. Moberg signed seven contracts that identified him as a "subcontractor" of Terraqua and stated he would "function as an independent Subcontractor, with rights to control the means of performing the services listed herein and to perform services for other clients." CP at 582-611. But federal cases applying the FLSA do not attach importance to the employer's label for its employees, and because the MWA is based on the FLSA, federal authority under the FLSA provides helpful guidance. *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 298, 996 P.2d 582 (2000). "[A]n employer's self-serving label of workers as independent contractors is not controlling." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2nd Cir. 1988).

One reason for attaching no importance to the employer's label is that different tests control whether one is an independent contractor or employee for different purposes, so even if the parties agree on the label, it is not clear what they mean by it. "The distinction between independent contractors and employees arose at common law to limit the principal's vicarious liability for the misconduct of a person rendering service to the principal." *Anfinson*, 159 Wn. App. at 51. "In this context, the principal's supervisory power was crucial because '[t]he extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question [of] whether the employer ought to be legally liable' for the worker's actions." *Id.* (alteration in original).

13

The purpose of distinguishing employees from independent contractors is substantially different when a statute provides remedial protections to workers. *Id.* at 50-51. The result is a substantially different definition of employee. Under the MWA, an employee includes any individual "permit[ted] to work" subject to statutory exceptions, none of which apply here. RCW 49.46.010(2); *Anfinson*, 174 Wn.2d at 867. "This is a broad definition." *Id.*

Another reason for attaching no importance to an employer's label is that an employee is not permitted to waive employee status, so the fact that a worker signs contracts stating he or she was an independent contractor is not dispositive. *Rochicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (citing *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 269 n.3 (5th Cir. 1982)). Even the worker's subjective opinion that he is a businessman rather than an employee does not change his status. *Id.* (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1315 (5th Cir. 1976)). Similarly, the fact that an employee is issued a Form 1099 and reports his income and expenses as a sole proprietor for tax purposes is also not controlling. *See Olson v. Star Lift Inc.*, 709 F. Supp. 2d 1351, 1356 (S.D. Fla. 2010).

Mr. Moberg also asserts claims under the WPA and WRA, which prohibit employers from wrongfully withholding or diverting an employee's wages. RCW 49.48.010, 49.52.050. Those laws incorporate the "Industrial Welfare Act" definition of employee. RCW 49.48.082(5)(b). Under the Industrial Welfare Act, chapter 49.12

14

RCW, "'[e]mployee' means an employee who is employed in the business of the employee's employer whether by way of manual labor or otherwise." RCW 49.12.005(4).

Below, both parties assumed that "employee" as used in the WPA and WRA should receive the same construction as the term's meaning under the MWA. Given the remedial purpose of the statutes—both providing protections to workers—we assume without deciding that this is correct.[2] *But cf. Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 498, 663 P.2d 132 (1983) (relying on a tort case, *Hollingbery v. Dunn*, 68 Wn.2d 75, 411 P.2d 431 (1966), for the common law right to control test in applying the WRA, but with no indication that anyone suggested some other test might apply).

As earlier observed, courts consider the following nonexclusive factors to determine whether an individual was an employee or an independent contractor:

---

[2] We assume rather than decide the issue because it was not briefed by the parties. *See* RAP 12.1. Nonetheless, we note that the remedial purpose of the WRA "is to protect the wages of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of any part of such wages. The act is thus primarily a protective measure, rather than a strictly corrupt practices statute." *State v. Carter*, 18 Wn.2d 590, 621, 142 P.2d 403 (1943) (emphasis omitted). Our Supreme Court has characterized the MWA, WPA, and WRA, as a "comprehensive scheme" evidencing the legislature's strong policy in favor of payment of wages. *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 157, 961 P.2d 371 (1998). It also appears that the Washington Department of Labor and Industries applies the economic realities test to determine worker status under the WRA. *See* SUCHI SHARMA, WASH. STATE DEP'T OF LABOR & INDUS., EMPLOYMENT STANDARDS PROGRAM OVERVIEW 9, (undated), http://wastatecouncil.shrm.org/sites/wastatecouncil.shrm.org/files/ SHARMA%20Labor%20and%20Industries.pdf [https://perma.cc/P765-JPQS].

    (1)  the permanence of the working relationship between the parties;

    (2)  the degree of skill the work entails;

    (3)  the extent of the worker's investment in equipment or materials;

    (4)  the worker's opportunity for profit or loss;

    (5)  the degree of the alleged employer's control over the worker;

    (6)  whether the service rendered by the worker is an integral part of the alleged employer's business.

*Anfinson*, 159 Wn. App. at 52. No one of these factors is dispositive; rather, the test is based on a totality of the circumstances. *Superior Care*, 840 F.2d at 1059.

Viewing the evidence in the light most favorable to Mr. Moberg, genuine issues of material fact exist as to most of the six factors. As to the matter of the permanence of the working relationship between the parties, "Employees usually work for only one employer and the relationship is continuous and of indefinite duration. Independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them." *Harper v. San Luis Valley Reg'l Med. Ctr.*, 848 F. Supp. 911, 914 (D. Colo. 1994) (citations omitted). Terraqua emphasizes the one-year fixed duration of its contracts with Mr. Moberg; Mr. Moberg emphasizes the fact that the contracts were routinely renewed. In *Usery*, 527 F.2d at 1314, the court dealt with a similar situation: the status of operators of laundry pick-up stations who had one-year contracts that were routinely renewed. There, the court found the duration of the relationship suggested dependence on the employer rather than satisfaction with a contractual relationship, because none of the operators had a true business operation they

16

could offer to other laundry facilities—all the operators could transfer was their own labor. *Id.* This factor weighed in favor of employee status. *Id.*

Terraqua points to evidence that Mr. Moberg was happy working for Terraqua, which it contends explains the length of their contractual relationship. It also points to his contractual right to work for others, although Mr. Moberg's declaration raises a question of fact whether he could have exercised that right without having his contract with Terraqua terminated. Federal courts applying the permanency factor generally give more weight to the actual length of the working relationship than to the contractual right to terminate it. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 345 (5th Cir. 2008).

As to the matter of the degree of skill the work entails, the "skill" at issue here is not technical skill, because a variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees. *Superior Care*, 840 F.2d at 1060 (citing cases). It is, instead, whether the worker uses entrepreneurial skill to secure contract employment. *See id.* Neither party briefed the factor in these terms. It is undisputed, however, that Mr. Moberg never secured contract employment as a fish ecologist for anyone else during the years he worked for Terraqua.

As to the matter of the worker's investment in equipment or material, "Large personal investments are more representative of an independent contractor than an employee. Such investments include 'large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself.'" *Perez v. Super Maid, LLC*, 55 F.

17

Supp. 3d 1065, 1077 (N.D. Ill. 2014) (quoting *Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987). In weighing this factor, "courts must compare the worker's investment in the equipment to perform his job with the company's total investment." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 810 (6th Cir. 2015). We consider the capital investment in light of the broader question—whether it signifies the worker's economic independence—and may discount capital investment in items that the worker is likely to have for personal use, such as a vehicle and a computer. *Id.*

Terraqua emphasizes the fact that it did not maintain work space for its subcontractors, and that Mr. Moberg maintained his own. But Mr. Moberg's work and storage space were in his home. Terraqua also points to capital investments that Mr. Moberg made in business activities other than fish ecology work, such as farming. It cites no authority, nor did we find any, that a worker's activities unrelated to the type of service he is hired to perform for the employer is relevant in determining this or any other factor.

Most significant is Mr. Moberg's testimony that apart from his computer and vehicle, Terraqua provided him with the tools needed to do field work, including specialized gear like GPS[3] units, fish electro-shockers, total stations and other surveying equipment, data loggers, dry suits, wet suits, snorkel and masks and nets, among others.

---

[3] Global Positioning System.

18

It also reimbursed all his mileage. He testified that he would "routinely purchase this gear for Terraqua on the Terraqua company credit card," with Mr. Ward's approval. CP at 424. While Terraqua argues that it was client agencies like the BPA who actually paid for the gear, BPA did so pursuant to its contract with Terraqua. As between Terraqua and Mr. Moberg, it was Terraqua who held the BPA contract and thereby the ability to make the gear available. As a result, Mr. Moberg was not required to make large capital investments himself.

As to the matter of a worker's opportunity for profit or loss, the relevant inquiry is whether Mr. Moberg had an opportunity for profit or loss that depended on his own efficiency and managerial skill. *See Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365, 1371 (N.D. Fla. 2015). Managerial skill does not exhibit itself through working additional hours, which is analogous to an employee's ability to work overtime. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316-17 (11th Cir. 2013).

Terraqua argues that Mr. Moberg's contracts did not require full-time employment—a matter of some dispute, since in discovery responses, Mr. Moberg testified that he would not have had time to work for others. In any event, Terraqua argues that because the work was not full-time, Mr. Moberg had the ability to develop economic opportunities unrelated to the science he performed solely for Terraqua— opportunities such as his farm and a marijuana growing operation. Here again, Terraqua cites no authority that a less than full-time worker's ability to take on unrelated work is

19

relevant to dependence on an employer for the work that is at issue. To the contrary, federal cases hold that less than permanent full-time employment is indicative of independent contractor status if the lack of permanence is because the worker is successfully marketing his relevant skills to others—which is not the case here. It is not indicative of independent contractor status if it is due to "operational characteristics intrinsic to the industry," such as employers who use seasonal or part-time workers. *Superior Care*, 840 F.2d at 1060-61.

As to the matter of the employer's control over the worker, what is significant is whether the employee "exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Scantland*, 721 F.3d at 1313. Workers' control over the hours when they work is not indicative of independent contractor status. *Dole v. Snell*, 875 F.2d 802, 806 (10th Cir. 1989) (noting that flexibility in work schedules is common to many businesses and is not significant in and of itself); *accord Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984). In addition, if workers work from home or offsite, an employer's lack of control is not particularly significant. *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1384 (3d Cir. 1985)).

It does not matter that the control exercised by an employer might be dictated by regulations or by a customer's demands. As the Eleventh Circuit explained in *Scantland*, "Business needs cannot immunize employers. . . . If the nature of a business requires a

company to exert control over workers . . . then that company must hire employees, not independent contractors." 721 F.3d at 1316.

While Terraqua emphasizes the parties' contract language that Mr. Moberg will function "with rights to control the *means* of performing the services listed herein," the list of services required by the contract and other terms reflect aspects of Terraqua's control. CP at 611 (emphasis added). For instance, Mr. Moberg's last, 2010-11 contract included the following provisions:

- Terraqua identified the services and tasks to be performed, and that they must be performed in a "workman like fashion,"
- Terraqua dictated the format in which Mr. Moberg would invoice for work, when he could invoice, when he would be paid, and the documentary support he must retain to support expenses, and
- Terraqua identified Mike Ward as the person who would provide "[s]ubcontractor's direction."

CP at 611-12. Mr. Moberg's declaration in opposition to summary judgment provided a number of examples of the "subcontractor's direction" that he received from Mr. Ward.

Finally, as to the matter of whether Mr. Moberg's work was integral to Terraqua's business, it obviously was; Terraqua's core business—conducting science for clients— was performed by its subcontractors. Terraqua admitted at summary judgment that Mr. Moberg's work was integral to its business.

Considering all, reasonable jurors could find that the parties' contractual characterization of Mr. Moberg as a subcontractor was not based on economic reality but

21

that Terraqua "used the independent contractor business model," as Ms. Sloan put it, as a matter of convenience and cost savings. Mr. Moberg's evidence was sufficient to raise a genuine issue of material fact whether, under the totality of circumstances, he was misclassified as an independent contractor and should have been treated for purposes of the MWA, WPA, and WRA as an employee.

## II. PROMISSORY ESTOPPEL

To prevail on a claim of promissory estoppel, a party must demonstrate five elements:

> "(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise."

*Wash. Educ. Ass'n v. Dep't of Ret. Sys.*, 181 Wn.2d 212, 224-25, 332 P.3d 428 (2014) (alteration in original) (quoting *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 171-72, 876 P.2d 435 (1994)). "Importantly, '[p]romissory estoppel requires the existence of a promise' that is 'clear and definite.'" *Wash. Educ. Ass'n*, 181 Wn.2d at 225 (alteration in original) (quoting *Havens*, 124 Wn.2d at 172). "This court has adopted the *Restatement*'s definition of 'promise': 'A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Id.* at 225 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (AM. LAW INST. 1981)). But "[a] statement of future intent is not

22

sufficient to constitute a promise for the purpose of promissory estoppel. An intention to do a thing is not a promise to do it." *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 13, 98 P.3d 491 (2004).

Mr. Moberg asserts promissory estoppel as a basis for enforcing Mr. Ward's alleged promise to make him a partner of Terraqua. But Mr. Moberg's own deposition testimony as to statements made by Mr. Ward, reproduced above, establishes only that Mr. Ward made statements of future intent. Mr. Moberg himself admits that no formal commitment was ever made, that the terms were not discussed, and the issue was one to be worked out in the future. Such statements are too vague for a court to enforce.

Mr. Moberg's evidence does not raise a question of fact as to whether a clear and definite promise was made—an essential element of promissory estoppel. On that basis alone, summary judgment was proper.

## III. UNJUST ENRICHMENT

A party may bring a claim for unjust enrichment to recover the value of a benefit retained even absent any contractual relationship, if fairness and justice require it. *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008). The party must prove three elements: "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Id.* at 484-85.

23

Mr. Moberg claims he conferred on Terraqua the benefit of his "dedication, long hours and hard work." Br. of Appellant at 16. The result, he claims, was to expand field work and increase Terraqua's revenue, as evidenced by an increase in the value of Terraqua's contracts with the government from $42,141 in 2003 to over $1,000,000 in 2011.

It is clear the contracts Terraqua entered into increased in value. But Mr. Moberg provides no evidence that it was his efforts that resulted in the increase and no viable argument why the increased business should be viewed as an injustice to him rather than as Mr. Ward's reward for sound hiring and management decisions. "[T]o defeat a motion for summary judgment, a party must present more than '[u]ltimate facts' or 'conclusory statements.'" *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014) (second alteration in original) (quoting *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988)).

Mr. Moberg's citation to *Duckworth v. Langland*, 95 Wn. App. 1, 3-4, 988 P.2d 967 (1998) is inapposite. *Duckworth* relates to the enforceability of an oral partnership agreement. The issue here is whether Mr. Moberg conveyed a benefit to Terraqua that it would be unjust for Terraqua to retain without reimbursing Mr. Moberg. Dismissal of the unjust enrichment claim was proper.

24

No. 34390-1-III
*Moberg v. Terraqua, LLC*

## IV. Costs

Under RAP 14.2, the party who substantially prevails on appeal is entitled to costs. Because each party prevailed on significant issues, we decline to award costs.

We reverse summary judgment dismissal of the MWA, WPA, and WRA claims; affirm dismissal of the promissory estoppel and unjust enrichment claims; and remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Pennell, J.